(77 P.3d 993)
No. 88,451

JOHN C. LLOYD, M.D., *Appellant*, v. QUORUM HEALTH RESOURCES, L.L.C., and TERRY LAMBERT, *Appellees*.

Opinion filed March 14, 2003.

*Thomas A. Krueger,* of Krueger Law Office, of Emporia, for the appellant.

*Michael W. Merriam,* of Topeka, for the appellees.

Before MARQUARDT, P.J., LEWIS and PIERRON, JJ.

PIERRON, J.: John C. Lloyd, M.D., appeals the district court decision granting summary judgment to Quorum Health Resources, L.L.C. (Quorum) and Terry Lambert on his claims of tortious interference with contractual relations, defamation, and false light/invasion of privacy. We affirm.

Lloyd began working at the Newman County Memorial Hospital (Newman) in Emporia in 1986. Newman is controlled by a Board of Trustees (Board), which employed Quorum to operate and manage Newman. Terry Lambert is an employee of Quorum and the chief executive officer of Newman.

In May 1998, Paula Wilson, Newman's chief nursing officer, reported to Lambert that members of the nursing staff were complaining about Lloyd. The complaints centered on how Lloyd treated the nurses and his use of obscene language. Wilson reported that some nurses had consulted with an attorney concerning remedies available. Wilson had received this information from nurse supervisor Jan Macek and had heard similar complaints independently. Lambert asked Wilson to obtain confirmation from the "source" nurses who were complaining. Macek confirmed that complaints were being made and that the "source" nurses wished to remain anonymous.

Lambert then reported this information to the Board's chairman, Tom Thompson, who told Lambert to contact Newman's attorney. The Board called a meeting for June 19, 1998, to discuss the matter. As a result of the meeting and on advice of counsel, the Board conducted an internal investigation. Due to a conflict, the investigation was assigned to outside counsel who had employment law experience. Lloyd was notified of the investigation by a letter from

the Board, stating the basis for the investigation was reported "recurring unprofessional conduct." Lambert had no involvement with this initial investigative process.

Following the investigation, counsel recommended no further action be taken, and Thompson notified Lloyd by letter, stating:

"While the investigation revealed some concerns of members of the nursing staff regarding treatment by Dr. Lloyd, the investigation did not reveal persistent use of language or conduct by Dr. Lloyd which would be considered derogatory or discriminatory against women. To the extent that employees perceived any hostility in the working environment created by Dr. Lloyd, it did not appear to be based on gender bias, but rather arose out of disagreements with respect to the performance of duties."

Lloyd met with the Board on September 24, 1998, and accused the management staff of fabricating the original complaints. On advice of counsel, the Board conducted another investigation relating to Lloyd's allegation that the complaints had been fabricated. Lambert again asked Macek to contact the "source" nurses to confirm the substance of the reports. Macek contacted the "source" nurses, who for the most part were unwilling to participate further in the matter. On October 20, 1998, Lloyd was informed that the investigation was complete and that his allegations had been discredited.

Subsequently, Lloyd filed a complaint with the State Board of Nursing, alleging that Lambert had requested that Macek find corroboration for the complaints against him. The record does not reveal how the State Board of Nursing resolved this issue.

On April 16, 1999, Lloyd filed a petition in the district court, alleging tortious interference with contractual relations, defamation, and invasion of privacy against Quorum and Lambert. Quorum and Lambert moved for summary judgment, and on December 20, 2001, the court granted the motion.

Apparently, Lloyd had not sued Newman or the Board.

During discovery, Lloyd filed a notice of business records subpoena directed to the State Board of Nursing pertaining to the complaint he had filed. Quorum and Lambert filed a motion for protective order in connection with the subpoena, arguing that the

records were qualifiedly privileged, statutorily privileged, and irrelevant to the issues in the case.

Following an in-camera inspection of the State Board of Nursing records, the district court stated in part:

"The question is, too, is whether I'm going to release the board of nursing records. I'm not. I think they're confidential under 65-1165 [sic] and I can't—I don't think they're particularly relevant to the issue here. You sued Quorum and Lambert and I'm not sure exactly what your theory is, Mr. Krueger, but I would—I have reviewed them. I just don't think there's anything relevant to your cause of action there."

The court left open the possibility that Lloyd could revisit the issue if he could show that Lambert and Quorum "went outside the channels" or departed from the correct procedure in handling the investigation.

Lloyd argues he was entitled to the State Board of Nursing records during discovery and the records are not subject to any privilege.

The protection conferred on the documents is based upon the Kansas Nurse Practice Act, specifically, K.S.A. 65-1135. Interpretation of a statute is a question of law, and this court's review is unlimited. See *Babe Houser Motor Co. v. Tetreault*, 270 Kan. 502, 506, 14 P.3d 1149 (2000).

K.S.A. 65-1135(a) provides:

"Any complaint or report, record or other information relating to the investigation of a complaint about a person licensed by the board which is received, obtained or maintained by the board is confidential and shall not be disclosed by the board or its employees in a manner which identified or enables identification of the person who is the subject or source of such information . . . ."

The statute goes on to list three exceptions to this rule, none of which are applicable here.

Lloyd has failed to include the State Board of Nursing records as part of the record on appeal, and there is no indication he requested the records be included. Without these records, it is impossible for us to determine whether the district court erred in granting the protective order. See *State v. Norris*, 244 Kan. 326, 339, 768 P.2d 296 (1989) (failure to include psychiatric records reviewed in camera precludes appellate review). "An appellant has

the duty to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 777, 27 P.3d 1 (2001). Unless otherwise proven, we presume the district court made the correct decision.

As part of Lloyd's tortious interference with contractual relations claim, he alleges the investigative procedure used was improper in that it did not follow the peer group procedures mandated by K.S.A. 65-4921 *et seq.*, which require medical care facilities to establish and maintain an internal risk management program.

Whether Lloyd's alleged conduct falls under the requirements of the peer review statutes is based on statutory interpretation, a question of law over which this court has unlimited review. *Babe Houser Motor Co.*, 270 Kan. at 506.

K.S.A. 65-4915(a)(4) defines a peer review committee as a committee which is authorized to perform peer review. K.S.A. 65-4915(a)(3) defines "peer review" as including the following functions:

"(A) Evaluate and improve the quality of health care services rendered by health care providers;

"(B) determine that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care;

"(C) determine that the cost of health care rendered was considered reasonable by the providers of professional health services in this area;

"(D) evaluate the qualifications, competence and performance of the providers of health care or to act upon matters relating to the discipline of any individual provider of health care;

"(E) reduce morbidity or mortality;

"(F) establish and enforce guidelines designed to keep within reasonable bounds the cost of health care;

"(G) conduct of research;

"(H) determine if a hospital's facilities are being properly utilized;

"(I) supervise, discipline, admit, determine privileges or control members of a hospital's medical staff;

"(J) review the professional qualifications or activities of health care providers;

"(K) evaluate the quantity, quality and timeliness of health care services rendered to patients in the facility;

"(L) evaluate, review or improve methods, procedures or treatments being utilized by the medical care facility or by health care providers in a facility rendering health care."

One of the requirements of each medical care facility's internal risk management program consists of a reporting system whereby all health care providers, including agents and employees, report "reportable incidents" to the chief of the medical staff, chief administrative officer, or risk manager of the facility. K.S.A. 65-4922(a)(3). K.S.A. 65-4921(f) defines a "reportable incident" as "an act by a health care provider which: (1) [i]s or may be below the applicable standard of care and has a reasonable probability of causing injury to a patient; or (2) may be grounds for disciplinary action by the appropriate licensing agency." All proceedings with respect to "reportable incidents" are confidential and privileged under K.S.A. 65-4925.

The Newman County Memorial medical staff bylaws provide in relevant part:

"*Peer Review Officers*
"In recognition of the obligation of each member of the Staff to assist in the evaluation and improvement of the quality of care provided within the Hospital, and in the performance of other peer review functions specified in K.S.A. 65-4915, as amended, and to report knowledge of reportable incidents pursuant to the Hospital's risk management plan, each member of the staff is hereby designated as a peer review officer pursuant to K.S.A. 65-4915, as amended.

"*Representatives to Hospitals Committees*
"The medical staff shall assist in all quality assessment and improvement, risk management and utilization review functions performed by the Hospital. At least five members of the active medical staff shall be appointed by the chief of staff to serve on the Hospital's Medical Staff Quality Issues Committee. At least four members of the active Medical Staff shall be appointed by the Chief of Staff to serve on the Utilization Review Committee and shall periodically report on the proceedings of such committees to the Medical Executive Committee.

"Corrective Action
"*Criteria for Initiation*
"Any person may provide information to the Medical Staff about the conduct, performance, or competence of its members. When reliable information indicates a member may have exhibited acts, demeanor, or conduct reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the hospital; (2) unethical; (3) contrary to the Medical Staff bylaws and rules or regulations; or, (4) below applicable professional standards, a request for an investigation or action against such member may be initiated by the President of the Medical Staff, a Chief of Section, the Medical Executive Committee, the Administrator, or the Director of Q/RM.

*"Initiation*

"A request for an investigation may be given verbally or in writing, submitted to the Director of Q/RM, Medical Staff Quality Issues Committee and/or Medical Executive Committee and supported by reference to specific activities or conduct alleged. If the Medical Executive Committee initiates the request, it shall make an appropriate recording of the reasons.

*"Investigation*

"If the Medical Staff Quality Issues Committee or the Medical Executive Committee concludes an investigation is warranted, it shall direct an investigation to be undertaken. The Medical Staff Quality Issues Committee or the Medical Executive Committee may conduct the investigation itself or may assign the task to an appropriate medical staff officer, medical staff section, or committee, or through an out of hospital peer review system with a comparably credentialed physician. If the investigation is delegated to an officer, committee, or physician other than the Medical Executive Committee, such officer, committee, or physician shall proceed with the investigation in a prompt manner and shall forward a written report of the investigation to the Medical Executive Committee as soon as practicable. The report may include recommendations for appropriate corrective action. The member shall be notified that an investigation is being conducted . . . ."

The district court determined that the peer review investigatory procedures are directed at patient care issues and that the bylaws were not intended to preclude any other form of appropriate inquiry into issues of concern to Newman. Further, the court concluded that Lambert's decision to bring the complaints to the Board did not impinge upon Newman's medical bylaws or any contractual entitlement of Lloyd and therefore found there was no breach of contract. As a result, the court dismissed Lloyd's tortious interference claim. We agree.

Under K.S.A. 65-4914, the public policy relating to provision of health care is as follows:

"It is the declared public policy of the state of Kansas that the provision of health care is essential to the well-being of its citizens as is the achievement of an acceptable quality of health care. Such goals may be achieved by requiring a system which combines a reasonable means to monitor the quality of health care with the provision of a reasonable means to compensate patients for the risks related to receiving health care rendered by health care providers licensed by the state of Kansas."

The purpose of risk management programs is further defined in K.S.A. 65-4929(a):

"The legislature of the state of Kansas recognizes the importance and necessity of providing and regulating certain aspects of health care delivery in order to protect the public's general health, safety and welfare. Implementation of risk management plans and reporting systems as required by K.S.A. 65-4922, 65-4923 and 65-4924 and peer review pursuant to K.S.A. 65-4915 and amendments thereto effectuate this policy."

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in it." *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 378, 22 P.3d 124 (2001) (citing *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 [1998]).

Here, it is clear that the legislature intended peer review, as part of risk management, to relate to the quality of health care that patients receive. We should not read the risk management/peer review statutes to include the type of situation present in this case.

While the letter providing Lloyd with the notice of intent to investigate makes a reference to "patients" and uses the phrase "unprofessional conduct," there is nothing in the record to indicate that any conduct alleged implicated patient care except very indirectly. Under Title VII, once an employer receives a complaint of sexual harassment, it must take immediate and appropriate corrective action. *Goldbarth v. Kansas State Board of Regents*, 269 Kan. 881, 891, 9 P.3d 1251 (2000). An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over an employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998).

The district court stated:

"[T]he matter was seen as, and acted upon, as an internal personnel matter and a legal liability issue, potentially subjecting the hospital to suit, the investigative trigger words being 'talked to an attorney' and the use of the phrase 'hostile work environment' which implicated Title VII and KAAD liability issues. The fact that the investigation was delegated to a lawyer specializing in employment law is probative of the direction for the concern, rather than one to be processed as a

peer review/risk management issue or one thought focused on state disciplinary proceedings. This conclusion is reinforced not only by the absence of facts implicating the quality of patient care, which triggers the disciplinary code for the healing arts' jurisdiction, but by how the Board of Trustee's proceeded with their preliminary inquiry. The facts proffered by Plaintiff are simply insufficient as a matter of law to support any assertion that the investigation done was thought to be, or was, mandated to follow the Hospital's risk management/peer review procedures."

The district court properly determined that the Board was correct in its evaluation that the situation warranted an internal investigation and that Lloyd was not entitled to the use of Newman's peer review investigative procedures. As such, this argument necessarily fails.

Lloyd further argues that summary judgment was not proper in this case because the district court improperly determined issues of fact that should have been presented to a jury, specifically with respect to evidence of malice. He alleges there were several issues of material fact in dispute with respect to whether Lambert acted in bad faith or with malice in bringing complaints about Lloyd to the Board.

" 'Summary judgment is appropriate when the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

"An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]" *Bergstrom v. Noah*, 266 Kan. at 872.

The district court first determined that Lambert, as Newman's CEO, and Quorum, as Lambert's employer, owed a duty to the Board to investigate the claims made about Lloyd. As a result, Lambert's report to the Board was subject to a qualified privilege that Lloyd could defeat only by establishing that Lambert acted with malice. In its memorandum opinion and entry of judgment, the district court stated:

"Malice is a critical element of proof, given Mr. Lambert's privilege, upon any of Dr. Lloyd's claims made of false light-invasion of privacy [citation omitted], for defamation [citation omitted], and tortious interference with a contract [citation omitted]. Accordingly, for the reasons stated above, the Defendant's Motion for Summary Judgment should be sustained, as well, additionally as to each and every claim made by the Plaintiff for his failure to establish malice as there is no sufficient showing, as a matter of law, that, even if the report was false, Mr. Lambert knew of its falsity or otherwise recklessly acted without regard to its truth in making the report to the Board of Trustees concerning Plaintiff, Dr. Lloyd, by relying alone on the reports of his nurse supervisory staff without personal independent verification. Further, there is no personal motive substantively identified for Mr. Lambert's actions."

The elements of defamation include: (1) false and defamatory words (2) communicated to a third person (3) which result in harm to the reputation of the person defamed. *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, 102, 864 P.2d 744 (1993).

A qualified privilege exists with respect to business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication. *Turner v. Halliburton Co.*, 240 Kan. 1, 8, 722 P.2d 1106 (1986). Further, " '[w]here a defamatory statement is made in a situation where there is a qualified privilege the injured party has the burden of proving not only that the statements were false, but also that the statements were made with actual malice—*with actual evil-mindedness or specific intent to injure.*' " *Turner*, 240 Kan. at 8 (quoting *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920-21, 494 P.2d 1063 [1972]).

Thus, to establish a defamation action against Lambert, Lloyd must show: (1) Lambert uttered or wrote false and defamatory words; (2) Lambert communicated these statements to a third person; and (3) Lloyd's reputation was injured as a result. Also, assum-

ing Lambert acted in his official capacity as an agent of the Board, he would have no personal liability unless he acted with actual evil mindedness or a specific intent to injure. See *Clevenger v. Catholic Social Service of the Archdiocese of Kansas City*, 21 Kan. App. 2d 521, 526-27, 901 P.2d 529 (1995). Lloyd contends that the determination of whether Lambert had a qualified privilege and the issue of malice were questions of fact for the jury.

Whatever Lambert said to the Board was in reference to Lloyd's conduct, specifically, complaints about possible violations of Title VII and a possible class action lawsuit against Newman. There is no evidence that Lambert had a personal or improper motive. Clearly, this was within the scope of Lambert's employment as the hospital administrator, and any statements he made are subject to a qualified privilege.

The evidence Lloyd claims was presented on the issue of malice included that Lloyd and Lambert did not have a good relationship, Lambert was not happy Lloyd was still involved with Newman's obstetrics department, and Lambert believed people may choose not to have babies at Newman due to their dislike of Lloyd. Lloyd also states there had never been any prior complaints against him, and Lambert was not aware of Lloyd ever using obscene or profane language. Lloyd further alleges he presented evidence that Lambert may have asked Macek to locate nurses to corroborate complaints against Lloyd, and the conflicting evidence presented necessitates a jury finding concerning credibility.

This evidence does not show that Lambert knew the claims were false or that he acted with reckless disregard in repeating the statements without knowledge of their truth. Further, as stated by the district court, Lambert was not reckless for failing to contact the "source" nurses themselves before reporting this conduct to the Board. There is nothing in the record to indicate Lambert could not rely on Macek's or Wilson's reports or that Lambert was incorrect in taking this issue to the Board for its decision on how to proceed. The Board proceeded thereafter on the advice of counsel, and Lambert had no part in the actual investigation of Lloyd ordered by the Board.

Any evidence of malice presented by Lloyd is mere speculation or, as the district court stated, "an inference upon an inference upon an inference." The law is clear that "an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility." *Virginia Surety Co. v. Schlegel*, 200 Kan. 64, 69-70, 434 P.2d 772 (1967).

Summary judgment should be employed with caution in defamation cases. However, summary judgment may properly be granted when the evidence shows no liability as a matter of law and where the essential facts are not in dispute. *Clevenger*, 21 Kan. App. 2d at 530. A party opposing summary judgment may not rest merely on allegations, but must set forth specific facts to support its position. K.S.A. 2002 Supp. 60-256(e). The evidence, when viewed in a light most favorable to Lloyd, is insufficient to establish the existence of malice and defeat Lambert's qualified privilege.

Lloyd also claims Quorum and Lambert are liable for false light/ invasion of privacy. False light/invasion of privacy is one of four types of invasion of privacy, and the elements of the false light type are: " ' "(1) publication of some kind must be made to a third party; (2) the publication must falsely represent the person; and (3) that representation must be highly offensive to a reasonable person." ' [Citations omitted.]" *Dominguez v. Davidson*, 266 Kan. 926, 937, 974 P.2d 112 (1999).

Defamation and false light/invasion of privacy claims are treated similarly by the courts, and truth and privilege are defenses available in both causes of action. 266 Kan. at 938. For the reasons given above, Lloyd's false light/invasion of privacy claim must also fail.

Lloyd also contends that the Board's conduct gives rise to a tortious interference with contractual relations claim because the investigation was not conducted pursuant to the medical staff bylaws, which provide for confidential investigations. Lloyd argues that the failure to protect the investigation from public disclosure subjected him to ridicule and harmed his reputation.

The requirements for this tort are (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expec-

tancy by the defendant; (3) but for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct. *Turner*, 240 Kan. at 12.

Tortious interference with a contract is predicated upon malicious conduct by the defendant. Occasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged. *Turner*, 240 Kan. at 12-13. For the reasons given with respect to the defamation issue above, this claim must also fail.

Finally, Lloyd alleges the district court erred when it concluded that Lambert was not the legal cause of Lloyd's damages. Lloyd argues this was improper because the issue was addressed *sua sponte* by the district court and was contrary to the evidence presented.

Lloyd contends that Lambert and Quorum did not raise the issue of causation and, therefore, the district court erred in deciding this issue. This argument is without merit. In the motion for summary judgment, Lambert and Quorum contended the Board conducted the investigation as it saw fit and that Lambert was largely uninvolved. Quorum and Lambert clearly raised this issue below.

Normally, the presence or absence of negligence and causation are questions of fact. "However, these issues may be resolved by summary judgment where the facts of the case will support only one conclusion and reasonable minds could not differ as to that conclusion. [Citation omitted.]" *McCleary v. Boss*, 24 Kan. App. 2d 791, 792, 955 P.2d 127 (1997).

The district court determined that Lambert's conduct in reporting the allegations about Lloyd to the Board was within his official capacity as a hospital administrator and was without malice. The Board then assumed all responsibility and hired outside counsel to conduct the investigation. The evidence supports the finding that Lloyd's grievance, if any, should have been directed at the Board that actually conducted the investigation. However, even if the court did improperly rule on this issue, it is considered harmless error. Harmless error is error which does not prejudice the

substantial rights of a party. It affords no basis for reversal of judgment and must be disregarded. *Smith v. Printup*, 262 Kan. 587, 603, 938 P.2d 1261 (1997). This ruling did not prejudice Lloyd's substantial rights.

For all the reasons given above, summary judgment was properly granted.

Affirmed.