(113 P.3d 827)

No. 92,439

DUNCAN DAVIS, M.D., *Appellant,* v. VICTOR HILDYARD, M.D., and RAYMOND KETTING, M.D., *Appellees.*

Opinion filed June 17, 2005.

*Larry G. Michel,* of Kennedy, Berkley, Yarnevich & Williamson, Chartered, of Salina, for the appellant.

*Michael R. O'Neal,* of Gilliland & Hayes, P.A., of Hutchinson, for the appellees.

Before JOHNSON, P.J., PIERRON, J., and BUKATY, S.J.

PIERRON, J.: Duncan Davis, M.D., filed a defamation action against Victor Hildyard, M.D., and Raymond Ketting, M.D. After discovery, the trial court granted summary judgment in favor of the defendants. Dr. Davis argues the district court erred in con-

cluding the alleged slanderous statements were made in the context of peer review. Dr. Davis further contends there is sufficient evidence of malice and damages to allow the case to proceed to a jury trial. We disagree and affirm the trial court's well-reasoned opinion.

Dr. Davis is a general surgeon who lives in Goodland and provides medical services in both Thomas and Sherman Counties. In Thomas County, he provided surgical services at Citizens Medical Center (CMC) located in Colby. Dr. Davis has been practicing medicine in Thomas and Sherman Counties since approximately 1998. Dr. Hildyard and Dr. Ketting are licensed physicians and provide medical services in Thomas County as well. Dr. Hildyard has practiced medicine in Colby for nearly 30 years. Dr. Ketting joined Dr. Hildyard's practice in 1996.

On November 20, 2002, Dr. Davis filed a defamation action against Dr. Hildyard, Dr. Ketting, and Judith Sears, a member of the Board of Trustees of CMC, claiming that on one or more occasions the defendants made false and defamatory statements about him. Dr. Davis alleged that Dr. Hildyard made these statements against him at a medical staff meeting on August 27, 2002, and also similar statements at an emergency medical services meeting. Dr. Davis also alleged Dr. Ketting made defamatory statements at the same medical staff meeting concerning authorities exhuming some of Dr. Davis' past patients. The action against Judith Sears was eventually dismissed by Dr. Davis.

Regarding the medical staff meeting, Dr. Davis presented the deposition testimony of Michael Boyles, CEO of CMC from 2000 through 2003. Boyles stated: "Dr. Hildyard had stated during the course of a conversation in relation to the emergency room and surgical coverage, he had stated, and I can't remember the specific words, but it was either, 'Would you want a person operating on you,' or, 'I wouldn't want a person operating on me who can't get a license in any other state.' " Boyles stated that Dr. Ketting followed up Dr. Hildyard's comments with: "There are four or five lawsuits pending in Goodland, and they're exhuming bodies." Sears testified she heard Dr. Ketting's comment at the meeting about exhuming bodies and she relayed this information to the Board of Trustees of CMC at a board meeting.

Dr. Hildyard is also the medical director of the Thomas County Emergency Medical Services (EMS). He oversees the medically-related policy and procedures of the EMS, meeting with them once a month in a quality assurance setting to discuss cases, outcomes, and any problems in first responder care.

Regarding the statements made at the EMS meeting, Dr. Davis presented the deposition testimony of Kelly Focke, a medical assistant and emergency medical technician (EMT) living in Colby. Focke testified that at one of the regular monthly EMS business meetings prior to November 2002, Dr. Hildyard told the group of probably 20 EMTs that "Dr. Davis could not practice in the state of Colorado, and that there were three or four bodies being exhumed to find out the cause of deaths of patients of Dr. Davis."

In 1997, a formal complaint was filed against Dr. Davis before the State Board of Medical Examiners of Colorado by the Attorney General. The formal complaint alleged unprofessional conduct with regard to Dr. Davis' care and treatment of 11 patients. Dr. Davis stipulated to the final agency order. As a result of the disciplinary action in Colorado, Dr. Davis' license to practice medicine in Colorado was placed on probationary status for 5 years. Before he could perform surgery, he was required to have another surgeon sign the patient's chart allowing the surgery. Additionally, Dr. Davis was required to be accompanied by another surgeon during any surgical event. Dr. Davis was required to have a Colorado physician perform certain monthly monitoring of a required number of Dr. Davis' patients. The Colorado disciplinary order also contemplated that Dr. Davis would have a large portion of his practice in Kansas. Dr. Davis was required to have a certain number of cases per month in Colorado in order to fulfill his probationary status.

Dr. Davis testified in his deposition that he obtained staff privileges at CMC before the Colorado complaint was filed. He did not disclose the Colorado disciplinary action to the Board of Trustees of CMC. Dr. Davis stated he was unaware when the Board of Trustees finally learned of the disciplinary action, but that it was the subject of a Board of Trustees meeting in 1998 or 1999. Dr. Davis testified that Judith Sears was upset that he had not disclosed

the Colorado complaint. The information regarding Dr. Davis' Colorado disciplinary action was available on the Internet.

Dr. Ketting testified that, for the most part, he admitted to making the statements at the medical staff meeting on August 27, 2002. He said the comments were made in the context of a discussion concerning credentialing activities, specifically as to Dr. Davis. Dr. Hildyard denied making any statements at the medical staff meeting about anyone losing their license in Colorado. He said that he commented that there were restrictions on Dr. Davis' license in Colorado. Dr. Hildyard also denied making the statements at the EMS meeting attributed to him by another person.

The defendants dispute the accuracy of the claimed remarks attributed to them, but do not dispute that they made statements wherein they expressed concern over Dr. Davis' skills as a physician. Of course, for the purposes of summary judgment, we must assume the accuracy of Dr. Davis' claims though they are disputed at least in part by the defendants.

There is evidence in the record as to significant restrictions on Dr. Davis' license in Colorado, that some malpractice actions had been filed against him, and that one body had been exhumed as part of an investigation concerning Dr. Davis.

As a result of the defamatory statements, Dr. Davis alleged actual economic damages of $250,000 from the decrease in the use of his medical services. Dr. Davis also alleged noneconomic damages in the amount of $250,000 for the detrimental effect the statements have had on his life and family. Dr. Davis claimed there were patient cancellations due to the rumors, but he refused to cite any particular person who allegedly did cancel.

The trial court granted summary judgment in favor of Dr. Hildyard and Dr. Ketting. The court found the statements alleged by Dr. Davis were relayed at meetings covered by the peer review privilege and that the privilege "grants immunity from civil liability to any person who in good faith provides any information regarding a healthcare provider pursuant to the risk management process except upon clear and convincing evidence that the report or information was completely false and the falsity was known to the person providing the information."

The trial court found the statements alleged by Dr. Davis were confidential and the only evidence contained in the record indicated that if the statements were made, they were repeated outside of said meetings by others and not Dr. Hildyard and Dr. Ketting. The trial court stated Dr. Davis had presented only inferences of malice ("Dr. Hildyard has made disparaging remarks against other physicians in the past, and has not enjoyed good relationships with other physicians."), and that Dr. Davis had failed to demonstrate any damages that were directly attributable to the defendants.

The trial court's granting of summary judgment in this case raises three issues. The first is whether the trial court was correct in its conclusion that the statements made by Dr. Hildyard and Dr. Ketting were within the ambit of peer review. The second and third questions are whether there remain genuine issues of material fact with reference to the qualified privilege provided for in K.S.A. 65-442 and any alleged resulting damage to Dr. Davis.

K.S.A. 65-442 grants immunity in peer review processes in an effort to "encourage hospitals to actively engage in peer review of staff physicians." *Lemuz v. Fieser*, 261 Kan. 936, 950, 933 P.2d 134 (1997). This legislation was enacted under the belief that with the threat of liability removed, the effective use of peer review would increase and be promoted. 261 Kan. at 951.

K.S.A. 65-442 provides in pertinent part:

"(a) There shall be no liability on the part of, and no action for damages shall arise against, any duly appointed member of the governing board or the duly appointed member of a committee of the medical staff of a licensed medical care facility for any act, statement or proceeding undertaken or performed within the scope of the functions and within the course of the performance of the duties of such committee of the medical staff if such member acted in good faith and without malice, and the medical staff operates pursuant to written bylaws that have been approved by the governing board of the medical care facility."

Thus, K.S.A. 65-442 provides for a qualified privilege from liability for those statements made by any member of a medical staff committee, such as a peer review committee, in the furtherance of his or her duties, provided that those statements were made in good faith and without malice. *Smith v. Farha*, 266 Kan. 991, 994, 974 P.2d 563 (1999).

K.S.A. 2004 Supp. 65-4915(a)(4) defines a peer review commit-tee as a committee which is authorized to perform peer review. K.S.A. 2004 Supp. 65-4915(a)(3) defines "peer review" as including the following functions:

"(A) Evaluate and improve the quality of health care services rendered by health care providers;

"(B) determine that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care;

"(C) determine that the cost of health care rendered was considered reasonable by the providers of professional health services in this area;

"(D) evaluate the qualifications, competence and performance of the providers of health care or to act upon matters relating to the discipline of any individual provider of health care;

"(E) reduce morbidity or mortality;

"(F) establish and enforce guidelines designed to keep within reasonable bounds the cost of health care;

"(G) conduct of research;

"(H) determine if a hospital's facilities are being properly utilized;

"(I) supervise, discipline, admit, determine privileges or control members of a hospital's medical staff;

"(J) review the professional qualifications of activities of health care providers;

"(K) evaluate the quantity, quality and timeliness of health care services ren-dered to patients in the facility;

"(L) evaluate, review or improve methods, procedures or treatments being util-ized by the medical care facility or by health care providers in a facility rendering health care."

### The trial court found

"that any statements complained of by Dr. Davis, were made by the Defendants, at one of two meetings. The first such meeting was a medical staff meeting held at the Citizens Medical Center in Colby, Kansas. The second meeting was a meet-ing of emergency medical technicians also at the hospital in Colby. The court finds that both of said meetings are covered by the peer review privilege. Statements made at such meetings are confidential, and the only evidence contained in the record in this case would indicate that if said statements were made they were repeated outside of said meetings by others and not by Defendants."

We agree with the trial court's analysis.

Having affirmed the trial court's conclusion that the statements made at the meeting by Dr. Hildyard and Dr. Ketting are within the ambit of peer review, we address the second issue of whether, based upon the uncontroverted facts, the statements made are

privileged under K.S.A. 65-442. The protection afforded under the provisions of K.S.A. 65-442 exists only if the statements were made in good faith and without malice.

In the present case, the trial court, in its grant of summary judgment on the ultimate issue, concluded:

"[T]here is no direct testimony or evidence cited by either party to support Plaintiff's claim of malice on the part of the Defendants. Plaintiff attempts to infer malice by indicating that Dr. Hildyard has made disparaging remarks against other physicians in the past, and has not enjoyed good relationships with other physicians. The *Lloyd* court held that such inferences cannot be sufficient to show malice in a later situation involving other parties."

In *Lloyd v. Quorum Health Resources, LLC*, 31 Kan. App. 2d 943, 77 P.3d 993 (2003), the court addressed a similar claim of defamation, and false light/invasion of privacy. Lloyd, a physician, had been the subject of a hostile work environment investigation. After the investigation resulted in no disciplinary action taken against Lloyd, he filed the lawsuit. The district court granted summary judgment in favor of the defendants and Lloyd appealed, arguing the district court improperly determined fact issues, specifically the allegations of malice. On appeal, the court found Lloyd's claims of malice were speculative or inferences based upon inferences. 31 Kan. App. 2d at 954.

We acknowledge the hesitancy with which we should grant summary judgment in cases of this nature as expressed in *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 605, 738 P.2d 1246 (1987):

"A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties. *Gleichenhaus v. Carlyle*, 226 Kan. 167, 597 P.2d 611 (1979); *Bowen v. Westerhaus*, 224 Kan. 42, 578 P.2d 1102 (1978). The existence of malice is ordinarily a question of fact for the jury, but where the facts are not in dispute, it is a question of law for the court. *Redmond v. Sun Publishing Co.*, 239 Kan. 30, 36, 716 P.2d 168 (1986); *Gleichenhaus v. Carlyle*, 226 Kan. at 169. Summary judgment should be employed with caution in a defamation case."

In *Ross v. Wal-Mart Stores, Inc.*, 730 F. Supp. 357, 361 (D. Kan. 1990), the court stated that the proof of malice in defamation actions when a qualified privilege is found to exist requires a plaintiff

to prove that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false. However, one subject to the privilege may not

"automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732, 20 L. Ed. 2d 262 , 88 S. Ct. 1323 (1968).

In *Knudsen v. Kansas Gas & Electric Co.*, 248 Kan. 469, 480-81, 807 P.2d 71 (1991), the court stated that protection under a qualified privilege exists only in the absence of lack of good faith or malice. The court held:

"In general, the question of actual malice in a defamation action is a question of fact for the jury. However, under certain circumstances, a motion for summary judgment and the granting of that motion are appropriate. If the plaintiff fails to offer clear and convincing evidence of an extrinsic character to prove actual malice on the part of the defendant in the publication of a slander on a qualifiedly privileged occasion, there is no issue of material fact to be determined, and it is the duty of the trial court to grant the defendant's motion for summary judgment." 248 Kan. 469, Syl. ¶ 4.

We agree with the trial court that Dr. Davis has failed to offer clear and convincing evidence of an extrinsic character to prove actual malice on the part of Dr. Hildyard or Dr. Ketting.

The statements in this case were made in the context of peer review proceedings, and Dr. Davis has failed to demonstrate clear and convincing evidence of malice that would lift the cloak of protection from these privileged statements.

The trial court's finding that Dr. Davis failed to establish any evidence of damages directly attributable to Dr. Hildyard and Dr. Ketting is not necessary to a final disposition of this appeal. However, we will address the issue as it has been ably argued by both parties and is an issue which will often arise in cases of this nature.

The elements of defamation include false and defamatory words, communicated to a third person, which result in harm to the rep-

utation of the person defamed. *Luttrell v. United Telephone System, Inc.*, 9 Kan. App. 2d 620, 620-21, 683 P.2d 1292 (1984), *aff'd* 236 Kan. 710, 695 P.2d 1279 (1985). In *Moran v. State*, 267 Kan. 583, 599, 985 P.2d 127 (1999), the court stated the following regarding damages and proof:

"In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), the United States Supreme Court ruled: 'It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury.' 418 U.S. at 349. *Gertz* changed the law in Kansas. Damages recoverable for defamation, whether per se or not, could no longer be presumed but must be proven."

Broad and factually unsupported allegations of patient cancellations do not support a claim for damages for alleged defamation. Further, there is insufficient evidence in the record of harm to Dr. Davis' reputation or evidence of damage by reason of injury to his reputation. We agree with the trial court that Dr. Davis has failed to establish a causal relationship between his alleged damages, both economic and noneconomic, and the statements made by Dr. Hildyard and Dr. Ketting.

The legislative history on this provision of qualified privilege is sparse. However, the statute obviously shows a legislative intent to encourage full discussion of health care issues in the context of peer review meetings, which are intended to be confidential.

While the allegations of what was said is disputed, it appears clear that the general nature of the comments dealt with the vital issue of physician competence. While Dr. Davis' disputed version of the comments may not have been completely true, the substance of the concerns expressed by the defendants was generally true and addressed the issues that are the object of the statute.

It would defeat the obvious purpose of the statute to force cases of this kind into trial based on allegations of the nature that we have here, when it is obvious that the basic substance of them; unreported restrictions on Dr. Davis' license in Colorado, malpractice law suits, and the exhumation of a former patient, are true.

Under the facts of this case, the trial court was correct to grant summary judgment.

Affirmed.

JOHNSON, J., concurring: I believe the majority's application of K.S.A. 65-442 to the Thomas County Emergency Medical Services meeting pushes the qualified privilege from liability to its limit. Nevertheless, I can concur with the majority's finding because of the importance of encouraging open and candid discourse among those in the medical community to foster vigilance in evaluating physician competence.

I also share the majority's hesitancy premised upon our Supreme Court's directive to be cautious in using summary judgment in a defamation case. However, given the manner in which this case was presented, I can vote to affirm the district court's ruling that the plaintiff's attempts to create an inference of malice were ineffectual to avoid summary judgment.

Finally, I wholeheartedly agree that, given the foregoing findings, we need not address the district court's ruling that Dr. Davis failed to establish any evidence of damages directly attributable to Doctors Hildyard and Ketting. Thus, we should have resisted the temptation to editorialize on whether, resolving all the facts and the inferences which may reasonably be drawn therefrom in favor of Dr. Davis, the defendants are entitled to judgment as a matter of law on the issues of causation and damages. Therefore, my concurrence specifically excludes the majority's judicial dicta on damages and causation.