No. 114,403

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SAGE HILL,
*Appellant/Cross-appellee*,

v.

STATE OF KANSAS and ERNEST GARCIA,
*Appellees/Cross-appellants*.

SYLABUS BY THE COURT

1.

Appellate courts have unlimited review of the trial court's decision to grant or deny a motion to dismiss for failure to state a claim. Nevertheless, appellate courts must interpret the well-pleaded facts in the light most favorable to the plaintiff.

2.

Plaintiffs suing under the common-law tort of retaliation, which is a tort recognized as a public policy exception to the general rule of at-will employment, are not required to exhaust administrative remedies under the Kansas Judicial Review Act because they do not seek review or reversal of any administrative finding.

3.

A private right of action under a specific act and an action for the common-law tort of retaliation are two distinct actions. The Transparency in Lawsuits Protection Act, K.S.A. 2015 Supp. 60-5201, does not apply to common-law retaliation tort actions because this tort arises based on a public policy exception to at-will employment, not based on language contained in a specific act.

1

4.

To determine if a public policy exception to at-will exists, courts must consider the plain language of a statute to ascertain the legislature's intent. Courts should not declare that a public policy exception exists unless there is no doubt of the legislature's intent.

5.

Even if a public policy exists, plaintiffs may not sue for the common-law tort of retaliation if an adequate alternative remedy exists under some other statute.

6.

There is a strongly held public policy against State employers retaliating against State employees for using their appeal rights under K.S.A. 75-2949 of the Kansas Civil Service Act (KCSA).

7.

When employees have an alternative remedy under the KCSA, which would furnish the aggrieved employees with adequate or suitable relief, they are not entitled to bring a common-law tort of retaliation as a public policy exception to the general rule of at-will employment.

8.

Kansas has recognized two types of common-law retaliation torts: retaliatory discharge and retaliatory demotion. Central to all common-law retaliation torts is a showing of harm, for instance, that a plaintiff has suffered a loss of job status, a loss of pay, or a loss of benefits. When a job placement or transfer involves a lateral move devoid of any recognizable harm in the form of diminished job status, decreased pay, or reduced benefits, it cannot constitute a valid common-law tort for retaliation as a public policy exception to the general rule of at-will employment.

2

9.

The State does not waive its sovereign immunity under the Kansas Torts Claim Act (KTCA) when plaintiffs attempt to sue for a retaliatory job placement devoid of any recognizable harm, for instance, diminished job status, decreased compensation, or reduced benefits. For K.S.A. 2015 Supp. 75-6103(a) of the KTCA holds the State liable only to the extent that "a private person, would be liable under the laws of the State." Moreover, no private person could be held liable for a nonexistent common-law tort.

10.

At the summary judgment stage, to establish a prima facie case of retaliation, plaintiffs must provide the following evidence: (1) that they had engaged in a protected activity; (2) that the employer knew they had engaged in a protected activity; (3) that the employer then took some adverse employment action against them; and (4) that this adverse employment action was causally connected to their use of the protected activity. If plaintiffs cannot establish a prima facie case of retaliation, summary judgment is appropriate.

11.

Once plaintiffs establish a prima facie case of a retaliatory employment action, the defendant-employer must be given the opportunity to rebut plaintiffs' prima facie case. If the defendant-employer provides a legitimate and nondiscriminatory explanation for the alleged retaliatory action, the burden shifts back to plaintiffs to establish that the defendant-employer's explanation was a pretext.

12.

When plaintiffs cannot establish that the defendant-employer's explanation was a pretext, summary judgment is appropriate.

Appeal from Shawnee District Court; REBECCA W. CROTTY, judge. Opinion filed December 9, 2016. Affirmed in part, reversed in part, and dismissed.

*Morgan L. Roach* and *Michael T. Miller*, of McCauley & Roach, LLC, of Kansas City, Missouri, for appellant/cross-appellee.

*M.J. Willoughby*, assistant attorney general, and *Derek Schmidt,* attorney general, for appellees/cross-appellant.

Before SCHROEDER, P.J., GREEN, J., and STUTZMAN, S.J.

GREEN, J.: Sage Hill, a Kansas Highway Patrol (KHP) trooper, appeals the trial court's order granting summary judgment in favor of the State of Kansas and Ernest Garcia, the former Superintendent of the KHP. Hill contends that the trial court erred when it granted their summary judgment motion. Hill maintains that because he successfully appealed his job dismissal to the Kansas Civil Service Board (KCSB), the State and Garcia improperly retaliated against him, upon his reinstatement, by relocating his job to a different geographical area of the state.

The State and Garcia cross-appeal, arguing that the trial court erred by denying their respective motions to dismiss because (1) Hill has failed to appeal in accordance with and exhaust his administrative remedies as provided by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.*; (2) Hill cannot bring a private right of action against them under K.S.A. 75-2949 of the Kansas Civil Service Act (KCSA); and (3) Hill is barred from bringing his action because the State has not waived its sovereign immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*

As discussed later, the trial court erred when it denied the State and Garcia's motions to dismiss because (1) Hill was not suing for a tort recognized under Kansas law; and (2) the State had not waived sovereign immunity under K.S.A. 2015 Supp. 75-

4

6103(a) of the KTCA. Nevertheless, even if the trial court had not erred by denying the State and Garcia's motions to dismiss, Hill would not be entitled to relief because the trial court correctly granted the State and Garcia's summary judgment motion. Accordingly, we affirm in part, reverse in part, and dismiss Hill's action.

*Background Information*

In Kansas, the KHP assigns its troopers to divisions labeled Troop A through Troop G. In January 2008, the KHP hired Hill as a trooper. After completing trooper training, Hill was assigned to Cherokee County, Kansas, within Troop H. Troop H is located in the very southeastern portion of Kansas. During that time, Hill lived in Columbus, Kansas, which is within Cherokee County. Hill's direct supervisor in Troop H was Lieutenant Edna Cordner. Lieutenant Cordner's direct supervisor was the commander of Troop H, Captain Richard Wilson.

In May 2011, a civilian complained to the Galena City Police Office that Hill was very rude to her during a traffic stop. At some point, Lieutenant Cordner learned about the complaint. Lieutenant Cordner contacted Hill, telling him that the KHP would have to investigate the stop. In doing so, however, she gave him some incorrect information about the traffic stop, including the date of the stop. Hill then spoke with Lieutenant Cordner, voicing his concern that she did not have the right date of the traffic stop. During this conversation, Lieutenant Cordner told Hill that she had never actually spoken to the complainant but had instead learned about the complaint from Police Officer Wayne Nelson. This concerned Hill because he, as well as other troopers and law enforcement personnel, believed that Lieutenant Cordner and Officer Nelson were having a romantic relationship. Thus, it seems that Hill was concerned that Lieutenant Cordner had not followed the proper protocol for dealing with this civilian complaint.

5

On August, 25, 2011, Hill and Lieutenant Cordner met in a parking lot to discuss the complaint. While Hill secretly recorded their conversation, he questioned Lieutenant Cordner's authority to investigate the complaint.

The next day, Lieutenant Cordner told Captain Wilson that Hill had threatened, disrespected, intimidated, and defamed her during their conversation. This resulted in an investigation of Hill for insubordination by a KHP Professional Standards Unit (PSU). The PSU recommended Hill be dismissed for insubordination, and this recommendation was sent to the KHP superintendent, Colonel Ernest Garcia. Garcia followed the PSU's recommendation, dismissing Hill on November 3, 2011.

Hill appealed his dismissal to the KCSB under K.S.A. 75-2929d(a)(1) and K.S.A. 75-2949(d)-(f) of the KCSA. On December 6, 2012, the KCSB modified Garcia's decision to dismiss Hill to a 1-year suspension without pay or benefits. The KCSB determined that the content of Hill's secret recording established that he had no "preconceived intention to intimidate, threaten, defame, or blackmail Lt. Cordner." Moreover, the KCSB determined that dismissal was too harsh a punishment because "Lt. Cordner's reaction, both in the tone of her voice and her responses did not indicate that she was under duress or was feeling intimidated." Nevertheless, the KCSB decided to suspend Hill for 1 year without pay or benefits because he had secretly recorded Lieutenant Cordner, he had made inappropriate comments during the conversation, and he had otherwise used bad judgment.

Following the KCSB decision, Garcia's "command staff," which was composed of Lieutenant Colonel Alan Stoecklein, Major Mark Bruce, Major Mark Goodloe, Major DeVore, and Major Eichkorn, met to discuss what troop division Hill should be placed into upon his return to work. Captain Robert Maier, who commanded Troop E, had recently requested the command staff for 10 more recruits in Troop E. Troop E is located in the southwestern portion of Kansas and includes Garden City, which is located in

Finney County. Captain Maier explicitly told the command staff that Finney County was in the greatest need of all the 24 counties within Troop E. Captain Maier requested that three more troopers be placed in Finney County alone. The command staff agreed that the "manpower" in Troop E was drastically low and nearly at an emergency level. The command staff decided that Hill should be placed in Troop E. Lieutenant Colonel Stoecklein then recommended to Garcia that Hill should be placed in Troop E, with his home station located in Finney County. Garcia followed Lieutenant Colonel Stoecklein's recommendation and placed Hill in Troop E.

On December 13, 2012, Garcia sent Hill a letter, stating: "You are being returned to active duty effective November 6, 2012 and transferred from Troop H to Troop E, Finney County." Hill was notified that he would be placed on paid administrative leave from November 6, 2012, until February 1, 2013, at which time he was to report to his home station in Finney County. Hill was further notified that his moving expenses would be paid according to agency policy. Additionally, KHP returned Hill to his same pay grade and returned his sick leave balance.

On January 18, 2013, Hill filed a motion with the KCSB to enforce or amend. In essence, Hill argued that the KCSB's order required that he be placed back in Troop H. Alternatively, Hill argued that the KCSB should amend its final order to require the KHP to place him back in Troop H. On January 30, 2013, the KCSB denied both requests, explaining (1) that it never intended that Hill be placed back in Troop H and (2) that his request was untimely because it should have been filed within 15 days of the final KCSB order.

Meanwhile, Hill took two other actions in an attempt to avoid being placed in Troop E. First, on January 21, 2013, Hill made a hardship request to transfer to Troop H. Hill asserted that he needed to live and work within Troop H because his mother was sick. Follow up conversations between Hill and Captain Maier, his new direct supervisor

7

in Troop E, revealed that his mother lived 1½ hours away from Hill's current house located in the area of Troop H. Moreover, his mother was married and residing with her husband. Captain Maier shared this information with Lieutenant Colonel Stoecklein, who shared the information with Garcia. On February 5, 2013, Garcia denied Hill's hardship request "based on the circumstances," without further explanation.

Second, on January 22, 2013, Hill filed a new and separate appeal with the KCSB, challenging his placement in Troop E instead of Troop H. The KCSB dismissed Hill's appeal on May 1, 2013, because (1) it did not have authority to hear the appeal under K.S.A. 75-2929d(a)(1); and (2) it could not find that the KHP had committed any wrongdoing by placing Hill in Troop E instead of Troop H since the KHP superintendent had both statutory and regulatory discretion in deciding where to place troopers throughout the state.

Because none of his earlier attempts to avoid placement in Troop E succeeded, Hill reported for duty to Troop E as required on February 1, 2013. In his agreement for reimbursement for moving expenses, Hill acknowledged that he was accepting "employment/transfer" as a "Garden City Trooper" effective February 1, 2013. Despite this acceptance, Hill continued to try to get transferred back to Troop H. During the KHP's biannual "make-a-wish" program in February 2013, where troopers can request a voluntary transfer to another division, Hill requested a transfer to Cherokee County within Troop H. Captain Maier, who was required to make a recommendation on whether to grant the transfer, reported to Major DeVore that he could not recommend Hill's transfer based on the need for troopers in Troop E. Captain Maier pointed out that even with Hill and the two new troopers, Finney County was still short two troopers. As a result, Garcia denied Hill's transfer request because "a greater need exist[ed] for [Hill's] services in [his] present duty assignment."

8

On October 10, 2013, Hill made a second make-a-wish transfer request to Cherokee County within Troop H. Again, Captain Maier recommended denying the transfer request based on Troop E's manpower needs. On October 17, 2013, while his make-a-wish transfer was pending, Hill additionally applied for a transfer to El Dorado within Troop G. Troop G is a division which covers the Kansas Turnpike. Within this request, Hill asked that his "request to transfer back to Cherokee County [] take priority over this request." Garcia denied Hill's make-a-wish request on October 22, 2013, but granted Hill's Troop G turnpike transfer request on November 5, 2013. It seems that turnpike transfer requests are given based on seniority. As of this appeal, Hill's home station remains within Troop G.

*Hill Files Suit*

On May 31, 2013, between his first and second make-a-wish transfer requests, Hill sued the KHP, and Garcia personally, for the "common-law tort for retaliatory transfer and discrimination." Hill argued that the KHP's action of placing him in Troop E upon his return from his suspension and paid administrative leave violated the underlying public policy purposes of K.S.A. 75-2949(g). K.S.A. 75-2949(g) states: "No employee shall be disciplined or discriminated against in any way because of the employee's proper use of the [KCSB] appeal procedure" for dismissals, demotions, and suspensions. Hill asserted that he was entitled to an award of actual and punitive damages without stating the specific money amount he was requesting. Later, Hill clarified that he was seeking $9,000 in actual damages and $200,000 for pain and suffering.

On August 15, 2013, Hill filed his first amended petition. The substance of Hill's arguments were identical to his original petition. Nevertheless, Hill dropped his suit against the KHP and substituted the State of Kansas as a party in its place.

9

The State and Garcia filed a joint answer, denying that there was any retaliatory or discriminatory intent within the decision to place Hill in Troop E upon his return from his suspension and paid administrative leave.

*Motions to Dismiss*

Although substantively similar, the State and Garcia then filed separate motions to dismiss Hill's action. The State made three primary arguments within its motion. First, the State argued that the trial court lacked jurisdiction over Hill's action because he was attempting to collaterally attack the KCSB's decisions instead of "follow[ing] the statutorily mandated process, [KJRA]." Second, the State argued that under Kansas law, civil service employees cannot bring a common-law tort claim for "retaliatory transfer." Third, the State briefly mentioned that it was entitled to sovereign immunity from Hill's action because Hill was not suing for a recognized tort, meaning the State had not waived its immunity under K.S.A. 75-6103(a) of the KTCA. Garcia argued that Hill's action should be dismissed because (1) Hill was trying to review KHP agency action, meaning the KJRA provided the exclusive procedures for review; (2) Hill could not sue him for retaliatory transfer as no such tort existed, meaning Hill failed to state a claim upon which relief could be granted; and (3) Hill could not sue him because (a) he was not a proper party to the suit or, alternatively, (b) he had immunity as an agent of the State under the KTCA.

Hill responded that the trial court should deny the State's and Garcia's motions to dismiss. Citing *Lindenman v. Umscheid*, 255 Kan. 610, 875 P.2d 964 (1994), Hill argued that the KJRA was inapplicable because he was not challenging agency action but suing for the common law tort of retaliation. Citing *Campbell v. Husky Hogs*, 292 Kan. 224, 255 P.3d 1 (2011), Hill argued that he could sue for "retaliatory transfer" because a legitimate public policy was embedded within the language of K.S.A. 75-2949(g). In other words, Hill asserted that if the trial court did not allow him to proceed with his

10

action, it would undermine the legislature's intent of preventing employers from retaliating against employees for the proper use of KCSB appeal procedures. Finally, Hill argued that neither the State nor Garcia were entitled to immunity because parties cannot claim immunity under the KTCA when a plaintiff alleges that the parties committed additional tortious acts outside the scope of their authority as employers.

Both the State and Garcia replied to Hill's response to their respective motions to dismiss, repeating their arguments from their initial motions to dismiss.

The trial court denied both the State's and Garcia's motions in a single order. First, the trial court ruled that Hill's action was not subject to the KJRA because he was not seeking review of any agency action but suing for a common-law tort. The trial court cited to the KCSB's dismissal of Hill's second appeal for lack of jurisdiction as evidence that Hill had no remedy through the KCSB and, in turn, had no available remedy under the KJRA. Next, the trial court ruled that Hill could bring a common-law tort claim of "retaliatory transfer," even though it seemed no party had alleged such a tort before in Kansas. In making this ruling, the trial court relied on *Brigham v. Dillon Companies, Inc.*, 262 Kan. 12, 20, 935 P.2d 1054 (1997), where our Supreme Court recognized the common-law tort of retaliatory demotion as the logical extension of the tort of retaliatory discharge. Based on the *Brigham* holding, the trial court concluded that retaliatory transfer was also the logical extension of retaliatory discharge and demotion. Finally, the trial court ruled that the State's and Garcia's arguments regarding sovereign immunity were unpersuasive for two reasons: (1) because it believed that Hill could sue for retaliatory transfer, meaning the State had waived its immunity under K.S.A. 75-6103(a) and (2) because no other KTCA exception to the waiver of sovereign immunity applied.

Following the denial of their motions to dismiss, the State and Garcia jointly moved to reconsider the ruling not to dismiss Hill's action. In this motion, the State and Garcia argued that despite Hill's assertion to the contrary, he was attempting to review an

11

agency decision, meaning the KJRA provided the exclusive remedy for relief. In turn, the State and Garcia argued that Hill's May 2013 petition to the trial court for review of the KCSB's December 2012 order denying Hill's motion to enforce or amend was untimely under KJRA's 30-day time limit to appeal. The trial court rejected these arguments, reiterating that Hill was not attempting to review agency action but attempting to sue the State and Garcia for committing a tort.

*KHP Procedures*

In addition to K.S.A. 74-2105 *et seq.*, the laws specifically pertaining to the KHP, KHP has contracted with the Kansas State Trooper Association (KSTA) regarding certain rules. These rules are referred to as the "Memorandum of Agreement between the Kansas Highway Patrol and the Kansas State Troopers Association" (MOA). The MOA defines a transfer as "[t]he physical movement of a trooper/motor carrier inspector from the established county of residence." In relevant part, the MOA states under section 2 that "[t]he Association and patrol agree that the transfer of troopers/motor carrier inspectors in the appropriate unit either temporarily or permanently to any place in the state shall be the sole responsibility of the Superintendent of the KHP in accordance with K.S.A. 74-2106 and K.S.A. 74-2114." Concerning make-a-wish transfers, MOA section 2 states that troopers "may express preference for such transfer by writing the member's preferences to the Superintendent. All such statements of preference will be considered, but will not be binding." Section 3 further states that upon a trooper's make-a-wish transfer request, the "Superintendent maintains the right to deny any voluntary transfer request for the good of the agency or to maintain sufficient skill base in the area," and the "[f]ailure to grant a voluntary transfer shall not be grievable."

Moreover, according to Garcia's command staff, they would meet weekly to discuss various KHP issues. The command staff would come to an agreement on the issues based on the available information regarding KHP needs. Then, Lieutenant

12

Colonel Stoecklein would report the command staff's recommendations to Garcia. At his deposition, Garcia testified that he relied very heavily on his command staff's recommendations. Garcia explicitly stated that he trusted the advice of Lieutenant Colonel Stoecklein regarding the placement of Hill in Troop E upon his return to work and made all of his decisions regarding Hill's placement based on agency need.

*Hill's Employment Documents*

Hill's application with the KHP states that he would prefer to go to Cherokee or Labette Counties, but he was willing to go anywhere if hired. Furthermore, a printout of Hill's November 6, 2012, payroll sheet indicates that he was an active employee at that time.

*KHP Map and Table*

A map created by Major Bruce entitled "KHP Field Study Staffing by County," shows that in December 2012, there were only two troopers in both Finney County—within Troop E—and Cherokee County—within Troop H. There are 24 counties in Troop E and 16 counties in Troop H. Out of the 24 counties in Troop E, 14 counties had no assigned troopers in December 2012, with a total of 15 troopers covering the entirety of division Troop E. Meanwhile, out of the 16 counties in Troop H, 2 counties had no assigned troopers in December 2012, with a total of 25 troopers covering the entirety of division Troop H.

A table prepared by the KHP, based on 2013 data obtained from the Kansas Department of Transportation, shows how many miles a trooper within each division had to cover. A trooper in Troop E was responsible for 25,302 miles of highway. A trooper in Troop H was responsible for 19,454 miles of highway.

*Command Staff Reasoning Behind Hill's Placement in Troop E*

At their respective depositions, each member of the command staff testified that at the weekly meeting following the KCSB's order changing Hill's dismissal to a 1-year suspension, they decided Hill should be placed in Finney County within Troop E because of the severe shortage of troopers in that division. Major Eichkorn testified that the shortage of troopers in Troop E was the greatest shortage he had seen in his 26 years with the KHP. Major Devore explained that Troop E was functioning at "half strength at best," which meant there was no question to him that Troop E's need for troopers was the greatest. Captain Maier described the trooper shortage then as a near emergency.

According to Captain Maier, to be fully staffed, Finney County required at least six troopers. Evidently, four new recruits were supposed to be placed in Finney County following graduation from the academy, but two of the recruits failed to graduate. As a result, Finney County was patrolled by the two new recruits alone as of December 2012. At his deposition, Lieutenant Colonel Stoecklein pointed out that one benefit of placing Hill in Troop E was that Hill had experience and could start immediately without additional training. Major Goodloe also testified at his deposition that Hill had experience and could provide training to the new troopers, factoring in the command staff's decision to recommend to Garcia that Hill, upon his return, be placed in Troop E.

In explaining why Hill's February 2013 hardship request was denied, Lieutenant Colonel Stoecklein testified that he had recommended denying Hill's hardship request because Hill's mother lived with her husband, who could provide medical care to her if needed. Moreover, Tammie Lord, former counsel and current custodian of records for KHP, submitted an affidavit stating that Hill had never submitted medical documents to support his hardship request. According to Lord, the two troopers who were granted hardship requests in 2014 submitted medical documents in support of their requests. Lieutenant Colonel Stoecklein also testified that in the two instances when requests were

approved, members of the trooper's immediate family household had medical conditions which could be better treated in a different location. Even then, however, Lieutenant Colonel Stoecklein testified that neither of those troopers were transferred to the exact locations they had requested.

Regarding Hill's February 2013 and October 2013 make-a-wish transfer requests, Lieutenant Colonel Stoecklein testified that just because a trooper makes a request does not mean that the KHP will grant the request. Lieutenant Colonel Stoecklein admitted that when Hill made two make-a-wish requests to transfer from Troop E to Troop H there was also a trooper shortage in Troop H. Lieutenant Colonel Stoecklein explained that there was a shortage of personnel needs throughout the State. Nevertheless, Lieutenant Colonel Stoecklein explained that the decision was made to keep Hill in Troop E because Troop E was in even greater need than Troop H. In his affidavit, Major Bruce explained that make-a-wish transfers are sometimes granted, but such transfers are generally not granted when a trooper requests a transfer out of an underserved division.

Major Bruce admitted that he did not believe any KHP trooper had been involuntarily transferred during his 4 decades of service.

*Hill's Deposition Testimony*

During his deposition, Hill testified that he believed his placement in Troop E was retaliatory because Garcia was very angry with him based on what he saw at the hearing before the KCSB. Hill testified that although he loved working in Troop H, he did not get along with his supervisors in Troop H. Hill explained that during the time of his suspension and administrative leave he had been working with the Cherokee County Sheriff's Office. Hill also explained at his deposition that when he lived in Columbus, Kansas, while working in Troop H, he would visit his mother about once a month. Hill testified that he was seeking $9,000 for actual damages related to time he spent traveling

15

back and forth between his new residence in Garden City and his old residence in Columbus and $200,000 for pain and suffering "for the ten-month period [he was] in Garden City." Hill complained that the stress from the transfer resulted in him suffering from anxiety, depression, impotence, and an eye twitch.

*Motion for Summary Judgment*

On March 17, 2015, the State and Garcia jointly moved for summary judgment. In this motion, the State and Garcia argued that Hill had failed to establish a prima facie case of retaliation because there was no evidence that Hill was treated differently as a trooper in Troop E than as a trooper in Troop H. Next, the State and Garcia argued that for Hill to successfully sue them, he had to prove that KHP's reason for placing him in Troop E upon his return from suspension was actually retaliatory and that their explanation for his placement—because of an extreme shortage of troopers— was a mere pretext. Citing KHP maps and staff member's deposition testimony, the State and Garcia then emphasized that Hill's placement in Finney County within Troop E was because Finney County had the greatest need of troopers when Hill returned to duty. Thus, they argued there was a legitimate reason for the denial of Hill's hardship transfer request and make-a-wish transfer requests. They emphasized the following: (1) that Garcia had the discretion under KHP rules and regulations to place Hill wherever Hill was needed and (2) that Hill received the same pay and benefits upon his return from suspension. Accordingly, the State and Garcia asserted that Hill could not prove that they had retaliated or discriminated against him in any way. The State and Garcia also asserted that the trial court should grant summary judgment because Hill could not establish that their critical shortage of troopers in Troop E explanation was a pretext.

In addition, the State and Garcia asserted that Hill's placement in Troop E upon his return from suspension and paid administrative leave was an "assignment" and not a "transfer." The State and Garcia made this distinction because newly employed KHP

troopers cannot be transferred from one division to another division since they do not have an assigned division yet. According to the State, to be transferred, a trooper must first have an assigned division, and since Hill had not been employed with the KHP over a year upon his return to work in February 2013, he had no assigned division. Thus, the State and Garcia asserted that Hill's arguments regarding being involuntarily transferred were unfounded because he had not been transferred at all.

To support their summary judgment motion, the State and Garcia attached the command staffs' depositions, Captain Maier's deposition, Garcia's deposition, Hill's deposition, and the maps that were discussed earlier. The State and Garcia also attached the KCSB's orders, the documents pertaining to Hill's hiring, the letter from Garcia dismissing Hill, the letter from Garcia placing Hill in Troop E following his suspension and paid administrative leave, the transfer requests made by Hill, and the letters from Garcia denying those requests.

In responding to the State and Garcia's motion for summary judgment, Hill agreed that to successfully sue the State and Garcia for retaliatory transfer, he was required to establish that the State and Garcia's reasoning for placing him in Troop E—the critical shortage of troopers in Troop E reasoning – was a mere pretext. Hill argued that he survived this burden because the following evidence proved that the State and Garcia's critical shortage of troopers in Troop E explanation was a mere pretext: (1) Garcia was angry with him during the KCSB hearing regarding his dismissal; (2) Garcia denied his hardship transfer request and make-a-wish transfer requests; (3) Garcia granted his transfer to Troop G request because turnpike bids are determined by seniority; (4) KHP did not typically make involuntary transfers; and (5) KHP placed other people in Troop H while he was stationed with Troop E. In regards to the State and Garcia's argument that Hill's placement in Troop E was an assignment, not a transfer, Hill argued that his placement in Troop E was clearly a transfer because (1) Garcia called it a "transfer" in the

17

December 2012 letter telling Hill he was reinstated and (2) KHP records listed him as an active employee as soon as he was placed on paid administrative leave.

In their reply to Hill's response, the State and Garcia reiterated that the reason Hill was placed in Troop E upon his return from his suspension and paid administrative leave was because of the critical shortage of troopers in Troop E. The State and Garcia pointed out that Hill did not provide any evidence to controvert the fact that there was a severe shortage of troopers in Troop E; instead, Hill merely made the speculative allegations that Garcia and his command staffs' reasoning was retaliatory. The State and Garcia further argued that the placement in Troop E was an assignment and not a transfer because Hill was not an employee of the KHP because he was working for another law enforcement agency while suspended and had to retake the KHP trooper oath upon his return to work.

The trial court granted the State and Garcia's motion for summary judgment. First, the trial court noted that to establish a prima facie case of retaliation, a plaintiff must show (1) that the plaintiff took some protected action; (2) that the employer knew about this protected action; (3) that the employer responded by taking some adverse employment action; and (4) that there was a causal connection between the protected action and the adverse employment action. Then, the trial court explained that Hill had failed to establish that his placement in Troop E constituted an adverse employment action since he had the same job, pay, benefits, and status upon his return to work after his successful KCSB appeal. The trial court further explained that even if Hill had established that KHP took an adverse employment action, he failed to establish a sufficient causal connection between the protected activity, which involved his use of KCSB appeal procedures, and the adverse employment action of his being placed in Troop E because Garcia was very angry with him.

Finally, the trial court determined that even if Hill had established a prima facie case, he had failed to establish that the State and Garcia's explanation about the critical

18

shortage of troopers was a mere pretext. The trial court explained that Hill's assertions that he was treated unfairly did not controvert the evidence: (1) that there was a severe shortage of troopers in Troop E and (2) that there were legitimate reasons why Hill's hardship and make-a-wish transfers were denied. Accordingly, the trial court ruled that Hill had failed to meet his burden of showing a pretext and granted the State and Garcia's motion for summary judgment.

*Appeal*

Hill timely appealed the trial court's decision to grant summary judgment in favor of the State and Garcia. The State and Garcia timely cross-appealed the trial court's decision concerning their motions to dismiss.

*Did the Trial Court Err by Denying the State's and Garcia's Motions to Dismiss?*

On appeal, the State and Garcia argue that the trial court erred by denying their respective motions to dismiss for three reasons. First, the State and Garcia argue that the trial court should have dismissed Hill's action because Hill's exclusive remedy was to appeal the KCSB's orders in accordance with the KJRA. Second, the State and Garcia argue that the trial court should have dismissed Hill's action because the KCSA does not create a private right of action that would allow Hill to bring this retaliatory job placement claim, which also does not constitute a valid tort. Third, the State and Garcia argue that the trial court should have dismissed Hill's action because the State had not waived its immunity under the KTCA.

Hill responds that the trial court correctly denied the State and Garcia's motions to dismiss because (1) he is not seeking review of an agency action, meaning the KJRA is inapplicable; (2) he is not bringing a private right of action under the KCSA but suing for the common-law tort of retaliation based on public policy; and (3) he can bring this

action because none of the sovereign immunity exceptions under the KTCA are applicable.

*Standard of Review*

When an appellate court examines the trial court's decision to grant or deny a motion to dismiss for failure to state a claim, it has unlimited review. *Cohen v. Battaglia*, 296 Kan. 542, 545-46, 293 P.3d 752 (2013). Appellate courts must interpret the well-pleaded facts in the light most favorable to the plaintiff. *Cohen*, 296 Kan. 545-46. Dismissal is improper if those well-pleaded facts state any claim upon which relief could be granted. *Cohen*, 296 Kan. 545-46.

*Overview of Important Provisions of the KCSA*

This case turns on the language of several provisions within the KCSA. The enacted purpose of the KCSA is

> "to establish a system of personnel administration that meets the social, economic and program needs of the people of the state of Kansas as these needs now or in the future may be established. This system shall provide means to recruit, select, develop and maintain an effective and responsible work force and shall include policies and procedures for employee hiring and advancement, training and career development, job classification, salary administration, retirement, fringe benefits, discipline, discharge and other related activities." K.S.A. 75-2925.

When public employees believe that they have been unfairly treated, they have a limited right to appeal to the KCSB. The KCSB may only hear appeals from public employees if their complaint falls into one of the statutorily recognized categories that allows appeal. Specifically, the KCSB

"shall hear appeals taken to it pursuant to (1) K.S.A. 75-2940, *75-2949* and 75-3747, and amendments thereto, concerning demotion, dismissal or suspension of a permanent employee in the classified service, or concerning refusal to examine an applicant or to certify a person as eligible for a job class, and (2) K.S.A. 75-2973 [whistleblowing] and amendments thereto concerning disciplinary action in violation of that statute." (Emphasis added.) K.S.A. 75-2929d(a).

K.S.A. 75-2949 governs the procedures concerning the dismissal, demotion, or suspension of public employees. Subsections (d)-(f) of K.S.A. 75-2949, explain what employees, employers, and the KCSB must do during the appeal process for dismissals, demotions, and suspensions. These are the procedures that Hill used in order to successfully appeal his initial dismissal from the KHP to the KCSB.

On appeal, Hill argues that K.S.A. 75-2949(g) includes an express statement on Kansas' public policy against retaliation for using the K.S.A. 75-2949(d)-(f) appeal procedures. K.S.A. 75-2949(g), states that "[n]o employee shall be disciplined or discriminated against in any way because of the employee's proper use of the appeal procedure."

*Transfer or Assignment?*

Before analyzing the State and Garcia's arguments, it is also important to point out that one of the primary disputes between the parties on appeal is whether Hill's placement in Troop E was a "transfer" or an "assignment." The State and Garcia assert that Hill's placement in Troop E was an assignment, emphasizing that Hill was not an employee with the KHP until his dismissal was amended to a suspension by the KCSB in December 2012. Hill, on the other hand, counters that this was a transfer, since he was employed as an active trooper before he was placed in Troop E. Moreover, he contends that this was a transfer because he was listed as an active trooper for payroll purposes before he was placed in Troop E and because Garcia used the term "transfer" when he placed him in

21

Troop E upon his return from suspension. All parties agree, however, that a "transfer" means that the KHP moves an active trooper from one home station to another home station without any change of job status, pay, or benefits, while an "assignment" means that the KHP places a newly hired trooper in his or her initial home station.

As Hill recognizes in his reply brief, the transfer versus assignment argument is wholly irrelevant to the outcome of whether a public policy exception exists. Therefore, we do not need to answer the question of whether Hill's placement in Troop E was a "transfer" or an "assignment." Consequently, the key question is not whether Hill was transferred or assigned to Troop E, but whether the underlying reason for his placement in Troop E was retaliatory. Thus, unless referencing one of the parties' specific arguments concerning a transfer or assignment, we will refer to Hill's post in Troop E as a "placement" or "job placement."

*Failure to Comply With the KJRA*

The State and Superintendent Garcia first argue that the trial court erred by denying their respective motions to dismiss because Hill failed to timely exercise the options available to him through the KJRA.

K.S.A. 2015 Supp. 75-2929h of the KCSA states that "the Kansas judicial review act shall be applicable to appeals from orders of the civil service board." A person may not file a petition for judicial review under the KJRA, however, until that person has exhausted "all administrative remedies available within the agency whose action is being challenged and within any other agency authorized to exercise administrative review." K.S.A. 2015 Supp. 77-612. Nevertheless, once an appeal is taken, K.S.A. 77-606 of the KJRA states that the KJRA "establishes the exclusive means of judicial review of agency action." K.S.A. 77-602(b) of the KJRA states that "'[a]gency action' means (1) [t]he whole or a part of a rule and regulation or an order; (2) the failure to issue a rule and

22

regulation or an order; or (3) an agency's performance of, or failure to perform, any other duty, function or activity, discretionary or otherwise."

On appeal, the State and Garcia assert that Hill's entire action is an attempt to collaterally attack the KHP's decision to place him in Troop E, which the State and Garcia argue constitutes an agency action. In turn, because Hill is actually trying to review agency action, he was (a) limited to appealing in accordance with KJRA procedures and (b) required to exhaust all of his administrative remedies at the agency level. In short, the State and Garcia argue that the trial court erred when it rejected their KJRA arguments because (1) Hill is suing to reverse agency action, meaning he was required to comply with KJRA appeal procedures and (2) Hill could have appealed the KCSB orders and filed a grievance with the KHP, meaning he failed to exhaust administrative remedies. They also argue that the trial court erred by relying on *Lindenman* in determining the KJRA was inapplicable.

*Agency Action Argument*

The State and Garcia contend that Hill is challenging this job placement by questioning the manner in which Garcia exercised his discretion, which falls within the definition of agency action under K.S.A. 77-602(b)(3). Technically, the State and Garcia are correct. The actual placement of Hill in Troop E was an agency action. The problem with their argument, however, is that Hill is not seeking review of his placement in Troop E. Instead, Hill is seeking review of the underlying motivation for the reason he was placed in Troop E, which does not involve a declared agency action but an alleged tort.

Despite the State and Garcia's argument to the contrary, *Lindenman v. Umscheid*, 255 Kan. 610, 875 P.3d 964 (1994), the case the trial court relied on in determining that Hill was not suing for agency action, is on point. In *Lindenman*, day care operators sued the Kansas Department of Health and Environment (KDHE) for torts committed by the

23

KDHE, including malicious prosecution and abuse of process. 255 Kan. at 610. The KDHE argued that the KJRA provided the exclusive means for review of any agency action, and because Lindenman's appeal did not comply with KJRA, it was entitled to dismissal. *Lindenman*, 255 Kan. at 616. Our Supreme Court disagreed, holding that the KJRA is not the exclusive remedy for plaintiffs bringing tort claims against the agency. *Lindenman*, 255 Kan. at 619-20. Our Supreme Court explained that while cases seeking review of agency action involve examining agency findings of fact, conclusions of law, and decisions, cases based in tort seek review of wrongful acts committed by the agency with a request for damages. *Lindenman*, 255 Kan. at 619-20. As a result of this holding, the *Lindenman* court also necessarily held that plaintiffs suing an agency for tort are not required to exhaust administrative remedies as stated under K.S.A. 77-612 of the KJRA. *Lindenman*, 255 Kan. at 619-20; see also *Platt v. Kansas State University*, 305 Kan. 122, Syl. ¶ 5, 379 P. 3d 362 (2016) (where our Supreme Court held that the KJRA does not apply to civil retaliation torts against administrative agencies).

Here, Hill is attempting to sue the State and Garcia for the common-law tort of retaliation, a tort which arises under the public policy exception to the general rule of at-will employment. Consequently, Hill, like Lindenman, is suing for a tort with the goal of obtaining money in compensation for the State and Garcia's alleged wrongdoing. Additionally, Hill's action, like Lindenman's action, does not seek the reversal of agency action or involve the examination of agency findings of fact, conclusions of law, or decisions.

Therefore, our Supreme Court's precedent holding in *Lindenman* clearly indicates that the KJRA does not provide Hill's exclusive means of review. Our Supreme Court precedent in *Lindenman* further states that Hill was not required to exhaust his administrative remedies before filing this action. Hence, the State's argument regarding Hill attempting to collaterally attack KHP's job placement decision and argument

24

regarding the inapplicability of *Lindenman* are incorrect. In turn, the trial court properly rejected these arguments.

*Failure to Appeal KCSB Orders or File a KHP Grievance Arguments*

The State and Garcia next argue that the trial court erred by denying their motion to dismiss because Hill failed to exhaust his administrative remedies as required under K.S.A. 2015 Supp. 77-612 of the KJRA. The State and Garcia argue that "[t]he agency actions of which Hill could have timely sought or at least attempted judicial review included the Civil Service Board's Orders of December 6, 2012, January 30, 2013, or even the May 1, 2013 Board order." The State and Garcia also argue that Hill failed to exhaust his administrative remedies by failing to file a grievance with the KHP concerning his placement in Troop E.

*KHP and MOA Grievance Procedures*

Internal KHP grievance procedures state as follows:

"II. Policy
. . . .
"C. It is the responsibility of all employees to conform with civil service rules, agency policies and reasonable work related instructions from supervisors. Should employees decide to file an official complaint or grievance, they should do it in a courteous manner and in accordance with these procedures.
"D. The following are non-grievable issues.
. . . .
"4. Any matter for which a statutory or regulatory appeal process exists (this process may not be used in addition to or in place of those processes)."

25

Based on the plain language of the preceding KHP grievance procedure policy, the KHP grievance procedure cannot be used unless a statutory or regulatory appeal process does not already exist. If such a process exists, a complainant's issue is "non-grievable" under the rules.

The Memorandum of Agreement between the Kansas Highway Patrol and the Kansas State Troopers Association (MOA) includes identical language. Article 20, "Grievance and Arbitration." Section 1 states under subsection E that the MOA grievance procedures "shall not apply to disciplinary action of demotion, termination, and suspension which shall be covered by the appeals procedure of the rules and regulations of the Department of Administration, *Kansas Civil Service Statutes* and Amendments thereto." (Emphasis added.) Although some parts of the MOA were included in the record on appeal, the parts concerning grievances were not. The only provisions of the MOA included in the record on appeal are the provisions on management rights and transfers. Nevertheless, at oral argument, counsel for the State and Garcia mentioned that Hill had an adequate remedy through the MOA grievance procedures.

*Analysis*

In their cross-appellants' brief, the State and Garcia include one paragraph where they assert that "Hill had remedies within the KHP." There are three primary reasons, however, why we hold that Hill did not have an adequate remedy under KHP grievance procedures.

First, as previously explained, because Hill is not seeking review or reversal of any agency action, he is not required to exhaust his administrative remedies under K.S.A. 2015 Supp. 77-612 of the KJRA. See *Platt*, 305 Kan. 122, Syl. ¶ 5; *Lindenman*, 255 Kan. at 619-20. Accordingly, this argument is meritless.

26

Second, as emphasized in the preceding section of KHP grievance procedures, a complainant has the ability to file a grievance under the KHP rules or MOA rules so long as the grievance does not involve an issue covered under the Kansas Civil Service Act (KCSA). As discussed below, KCSB had no jurisdiction to consider Hill's specific claim that he suffered a "retaliatory transfer" in violation of the public policy stated in K.S.A. 75-2949(g). Yet, that is not what the State and Garcia argue on appeal. Instead, the State and Garcia argue that Hill could have found a remedy through the KCSB and KJRA appeal process, a remedy under the KHP grievance procedures, and based on oral arguments, a remedy under the MOA grievance procedures. This argument is obviously incorrect because it ignores the plain language of the KHP rules and MOA rules stating that their respective grievance procedures are inapplicable for complaints covered by the KCSA.

Third, in their brief, the State and Garcia do not explain their grievance argument nor do they cite to a place in the record in support of their argument. The extent of the State and Garcia's arguments are limited to the following two points: (1) "It should also be emphasized that Hill had remedies within the KHP, including filing a grievance regarding the initial assignment, which he failed to exhaust as required by the KJRA, K.S.A. 77-612 (2015 Supp.)," and (2) "[h]ad Hill promptly availed himself of remedies before the KHP, the matter could have long ago been concluded in an efficient and cost-effective manner consistent with the KJRA."

Kansas courts have consistently held that a point raised incidentally in a brief and not argued therein is deemed abandoned. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 645, 294 P.3d 287 (2013). Moreover, a party claiming error has the burden of designating a record that supports his or her argument. *Friedman*, 296 Kan. at 644-45. Here, the State and Garcia submitted 40 pages of argument, which included only two sentences on KHP grievance procedure and absolutely no citations to the record. Again, the MOA procedures that were referenced at oral arguments were not even included in

27

the record on appeal or argued in their brief. Consequently, not only have the State and Garcia abandoned their argument, they have failed to comply with this court's rule on designating a record that supports a claim. As a result, their argument fails.

*Private Right of Action*

The State and Garcia's next argument is clearly incorrect. The State and Garcia argue that the trial court erred by denying their respective motions to dismiss because the plain language of the KCSA does not create a private right of action for employees complaining about a retaliatory transfer. In addition to looking at the plain language of the statute, the State and Garcia emphasize that the recently enacted Transparency in Lawsuits Protection Act (TLPA), K.S.A. 2015 Supp. 60-5201, supports their argument that the KCSA provides no private right of action for employees complaining about retaliatory transfers. Last, the State and Garcia cite several Kansas and federal cases in support of their argument that there is no private right of action.

Hill never contests that no private right of action exists under the KCSA for employees complaining about retaliation for appealing a dismissal, demotion, or suspension under K.S.A. 75-2949. Yet, Hill points out that he has not sued the State and Garcia under the KCSA. Instead, Hill explains that he is suing the State and Garcia based on the common-law tort of retaliation as a public policy exception to the general rule of at-will employment based on public policy found within subsection (g) of K.S.A. 75-2949. Accordingly, Hill requests that this court ignore the State and Garcia's arguments.

Hill is correct. This is clear from his petition and all his arguments below. For instance, in his petition, Hill explicitly states that he is suing the State and Garcia for "the common-law tort for retaliation and discrimination based upon public policy." Nothing in Hill's petition states or implies that he is suing under the KCSA. Accordingly, the State and Garcia have spent a great deal of time in their cross-appellant's brief knocking down

28

a straw man argument, failing to focus on the real issue, which is whether a public policy exception exists within the plain language of K.S.A 75-2949(g).

Nevertheless, a review of *Goolsby v. Mgmt. & Training Corp.*, No. 14-4019-SAC, 2014 WL 2988748 (D. Kan. 2014), is a good way to establish the difference between bringing a private right of action under the KCSA and bringing an action for a common-law tort based on a public policy exception to at-will employment. This case not only establishes the difference between these two things but also establishes why the State's argument regarding the TLPA is wrong.

*Goolsby and the TLPA*

In *Goolsby*, Goolsby sued her employer for wrongful discharge in retaliation for suffering an on-the-job injury and filing a workers compensation claim. 2014 WL 2988748, at *1. In the past, Kansas has held that retaliatory discharge for filing a workers compensation claim is one of the public policy exceptions to at-will employment, despite the fact no language within the Kansas Workers Compensation Act (KWCA) creates a private right of action for retaliation. See *Goolsby*, 2014 WL 2988748, at *2. Goolsby's employer asserted that in light of the 2012 TLPA, Goolsby could no longer sue for retaliatory discharge. *Goolsby*, 2014 WL 2988748, at *1.

The TLPA states as follows:

"(a) This section shall be known as the transparency in lawsuits protection act and shall be part of and supplemental to the Kansas code of civil procedure.

"(b) It is the intent of the legislature that no statute, rule, regulation or other enactment of the state shall create a private right of action unless such right is expressly stated therein.

29

"(c) Any legislation enacted in this state creating a private right of action shall contain express language providing for such a right. Courts of this state shall not construe a statute to imply a private right of action in the absence of such express language.

"(d) Nothing in this act shall be construed to prevent the breach of any duty imposed by law from being used as the basis for a cause of action under any theory of recovery otherwise recognized by law, including, but not limited to, theories of recovery under the law of torts or contract." K.S.A. 2015 Supp. 60-5201.

The trial court rejected Goolsby's employer's argument that the TLPA barred Goolsby from suing for retaliatory discharge as a public policy exception to at-will employment. In rejecting the employer's argument, the court explained:

"The terms of the TLPA, in particular subsections (b) and (c), are plainly aimed at impacting how courts analyze a negligence per se claim for whether the Kansas legislature intended a private right of action to be created by statute. And specifically, the Kansas Legislature in the TLPA declared its intent to create no private right of action unless the legislation expressly creates this right. . . .

"In contrast, the Kansas judicial opinions discussing the tort claim of retaliatory discharge against public policy do not share similar language and analysis with the TLPA. Over the last 30 years, Kansas courts have 'created' and expanded 'a common-law tort for retaliatory discharge.' [Citation omitted.] These are exceptions to the general employment-at-will doctrine for 'when an employee is fired in contravention of a recognized state public policy.' [Citations omitted] . . . .

"Instead of looking at whether the Kansas Legislature intended to create a private right of action, the Kansas courts look at whether a strongly held state public policy exists such that endorsing another exception to the at-will employment doctrine 'is necessary to protect' this policy 'from being undermined.'" *Goolsby*, 2014 WL 2988748, at *3-5.

The trial court then explained that when plaintiffs bring tort claims based on public policy exceptions that "'because the Act is merely a premise for the tort does not mean that the tort arises under the Act; instead, the Act is present only indirectly as

30

evidence of public policy.'"*Goolsby*, 2014 WL 2988748, at *5, quoting *Vasquez v. Target Corp.*, 2009 WL 1764525, at *2 (D. Kan. 2009).

*Goolsby* clearly explains the difference between bringing a private right of action under a law and bringing an action for a common-law tort of retaliation based on a public policy exception to at-will employment. *Goolsby* also explains that the TLPA is inapplicable when dealing with public policy exceptions because actions brought based on public policy exceptions are not brought under the statute in question. Instead, those actions are brought based on an underlying strongly held public policy that may or may not be explicitly stated within the statute. Accordingly, *Goolsby* also explains why the State and Garcia's first argument is clearly incorrect since Hill is trying to sue the State and Garcia for common-law retaliation based on a public policy exception to at-will employment derived from, but not under, K.S.A. 75-2949(g) of the KCSA.

Furthermore, it bears repeating that 60-5201(d) of the TLPA states that the TLPA must not be construed in a manner that bars a plaintiff from suing "under any theory of recovery otherwise recognized by law, including . . . theories under the law of torts . . . ." Clearly, because Hill contends that he is suing the State and Garcia under the common law tort of retaliation as a public policy exception to the general rule of at-will employment based on language condemning retaliation under K.S.A. 75-2949(g) of the KCSA, his action is like the actions described under subsection (d) of the TLPA. This is yet another reason why the State and Garcia's argument is unpersuasive.

*Caselaw*

Because the State and Garcia have cited so much caselaw in support of their argument that Hill cannot bring a private right of action under the KCSA, it is important to explain why that law is inapplicable or distinguishable.

31

First, the State and Garcia cite *Nichols v. Kansas Political Action Committee*, 270 Kan. 37, 11 P.3d 1134 (2000), and *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979), for the proposition that a plaintiff cannot sue unless the statute the plaintiff is suing under establishes civil liability. In those cases, the plaintiffs were suing defendants under the Campaign Finance Act and Investment Advisors Act of 1940, respectively, for remedies not available under those Acts. See and *TAMA*, 444 U.S. at 249; *Nichols*, 270 Kan. at 51. Similarly, the State and Garcia cite *Schrachta v. Curtis*, 752 F.2d 1257 (7th Cir. 1985), for the idea that there is no implied right to private action under the federal civil service act unless such an action is explicitly stated in the federal civil service act statute. *Schrachta*, like *Nichols* and *TAMA*, involved a plaintiff suing under a statute that did not include language allowing for the requested remedy. 752 F.2d at 1258. Yet, as pointed out earlier, Hill is not suing under the KCSA, but based on public policy found within KCSA. Thus, *Nichols*, *TAMA*, and *Schrachta* are inapplicable.

Second, the State and Garcia cite many Kansas cases for the proposition that a civil service employee's exclusive remedy for job-related issues is under the KCSA. See *Purvis v. Williams*, 276 Kan. 182, 185, 73 P.3d 740 (2003); *Wright v. Kansas Water Office*, 255 Kan. 990, 199-200, 881 P.2d 567 (1994); *Parker v. Kansas Neurological Institute*, 13 Kan. App. 2d 685, 687, 778 P.2d 390 (1989). All of these cases, however, involved the employee-plaintiff attempting to bring an action against the employer for an initial wrongful dismissal, which is explicitly covered by the appeal provisions detailed in K.S.A. 75-2949(d)-(f). These cases do not involve a situation, as in Hill's case, where the plaintiff asserted that he was retaliated against for using the KCSA appeal procedures contrary to the public policy stated in K.S.A. 75-2949(g). Accordingly, these cases are distinguishable.

Third, the State and Garcia rely on *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 26 P.3d 1246 (2001), for the proposition that the KCSA is the exclusive remedy of a

32

public employee-plaintiff, asserting that Hill's case and the *Connelly* case are indistinguishable. In *Connelly*, the plaintiffs asserted that the KHP dismissed them after whistleblowing. 271 Kan. at 952-53. Instead of appealing their alleged retaliatory discharges to the KCSB under K.S.A. 75-2973(d), a provision that provides public employees disciplined for whistleblowing the ability to appeal to the KCSB, the plaintiffs brought a common-law retaliatory discharge action against the KHP. *Connelly*, 271 Kan. at 952-53. Our Supreme Court held that the KCSA provided the exclusive remedy for the *Connelly* plaintiffs because there was a specific provision in the KCSA that provided the plaintiffs with a way to redress their allegations. 271 Kan. at 953-54.

Nevertheless, as addressed more fully later, KCSA does not contain language allowing employees to appeal retaliation as stated under K.S.A. 75-2949(g), even though K.S.A. 75-2949(g) states that discipline and discrimination for using the dismissal, demotion, and suspension appeal procedures is prohibited. As a result, the State and Garcia's interpretation of *Connelly* is called into question. Despite their contention to the contrary, *Connelly* is distinguishable from Hill's case, and the *Connelly* holding is limited to public employees suing for discharge in retaliation for whistleblowing.

Fourth, the State and Garcia rely on *Spagnola v. Mathis*, 859 F.2d 223, 225 (D.C. Cir. 1988), for the proposition that courts have "decline[d] to create a judicial remedy for Civil Service employees even where the Act itself provided none." Yet, this proposition is also called into question because, like the *Connelly* plaintiffs, the *Spagnola* plaintiffs had a remedy within the federal civil service act. The problem in *Spagnola* was that the *Spangola* plaintiffs attempted to bring a civil action in order to obtain monetary damages in addition to using the nonmonetary remedies under the federal civil service act. The United States Court of Appeals for the District of Columbia determined that under those circumstances, plaintiffs had an adequate remedy under the federal civil service act even though there was no monetary remedy. 859 F.2d at 229-30.

33

*Case of First Impression*

Having established that the real issue at hand is whether a public policy exception to at-will employment exists, we note that it is important to emphasize this is the first Kansas case where (1) a plaintiff has attempted to create a public policy exception to at-will employment based on the language under K.S.A. 75-2949(g) of the KCSA or (2) a plaintiff has attempted to sue for the common-law tort of retaliatory job placement (called retaliatory transfer by Hill), as opposed to retaliatory discharge or demotion. Moreover, because Hill is a public employee suing the State of Kansas, there is the added issue of sovereign immunity.

Analysis of Hill's argument that a new public policy exception to at-will employment exists based on the language of K.S.A. 75-2949(g) is made more difficult by the fact that the State has only argued that Hill was not entitled to bring a private right of action under the KCSA without addressing the merits of Hill's public policy exception argument. Generally, an issue not briefed by an appellant is abandoned. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011).

*Public Policy Exception*

Typically, Kansas has adhered to the employment-at-will doctrine, meaning that an employer could dismiss, demote, or otherwise make choices that negatively impacted an employee, for any reason. *Campbell v. Husky Hogs*, 292 Kan. 224, 227, 255 P.3d 1 (2011). Nevertheless, there are exceptions to this general rule. First, there are statutory exceptions, for instance, statutes preventing an employer from dismissing an employee based on race, gender, or disability. *Campbell*, 292 Kan. at 227. Second, there are public policy exceptions. In short, over the past 30 years, Kansas courts have whittled away at the at-will employment doctrine through public policy exceptions, allowing employee-plaintiffs to sue their employer under the common law theory of retaliatory discharge or

demotion when the employer has taken some action in violation of a recognized state public policy. *Campbell*, 292 Kan. at 227; *Brigham v. Dillon Companies, Inc.*, 262 Kan. 12, 935 P.2d 1054 (1997).

So far, Kansas courts have recognized five public policy exceptions, allowing employee-plaintiffs to sue employers for retaliatory discharge and retaliatory demotion. They are the following: (1) "filing a claim under the [KWCA], K.S.A. 44-501 *et seq.*"; (2) filing a claim under the Kansas Wage Payment Act (KWPA), K.S.A. 44-313 *et seq.*; (3) "filing a claim under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51 (2006) *et seq.*"; (4) whistleblowing; and (5) "exercising a public employee's First Amendment right to free speech on an issue of public concern." *Campbell*, 292 Kan. at 228, 234. For each of those five exceptions, Kansas courts reached the conclusion that an exception to the general rule of at-will employment was "necessary to protect a strongly held state public policy from being undermined." *Campbell*, 292 Kan. at 229.

To determine if a strongly held state public policy exists, courts must first examine the plain language of the statute to ascertain the legislature's intent. *Campbell*, 292 Kan. at 232. In cases, like this one, where an employee-plaintiff asserts that a strongly held public policy is embedded within a statute, courts "are faced with three situations: (1) The legislature has clearly declared the state's public policy; (2) the legislature enacted statutory provisions from which public policy may reasonably be implied, even though it is not directly declared; and (3) the legislature has neither made a clear statement of public policy nor can it be reasonably implied. [Citation omitted.]" *Campbell*, 292 Kan. at 230. "Before courts are justified in declaring the existence of public policy, '"it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt."'" *Riddle v. Wal-Mart Stores, Inc.*, 27 Kan. App. 2d 79, 86, 998 P.2d 114 (2000), quoting *Palmer v. Brown*, 242 Kan. 893, 897, 752 P.2d 685 (1988). Nevertheless, when there is an express statement of public policy within the statute, a strongly held public policy exists, and a plaintiff may be able to bring

35

a common-law tort for retaliation as a public policy exception to the general rule of at-will employment. *Campbell*, 292 Kan. at 232. Courts should look to the underlying purpose of the act and the legislative history, only if an express statement of public policy is not within the statute. *Campbell*, 292 Kan. at 232.

Even if a strongly held public policy exists, however, a plaintiff may still be barred from bringing a common-law tort for retaliation as a public policy exception to the general rule of at-will employment if that plaintiff has an adequate alterative remedy through some other statute. "Under the alternative remedies doctrine, a state or federal statute could be substituted for a state retaliation claim—if the substituted statute provides an adequate alternative remedy." *Campbell*, 292 Kan. at 236.

Thus, for Hill to bring his action against the State and Garcia as a public policy exception he must establish that a declaration of public policy exists and an adequate alternative remedy does not exist.

*Plain Language of K.S.A. 75-2949(g) Establishes That a Strongly Held Public Policy Exists*

The plain language of K.S.A. 75-2949(g) makes the declaration of public policy analysis short. To repeat, K.S.A. 75-2949(d)-(f) allows civil service employees to appeal their dismissals, demotions, or suspensions to the KCSB. Then, K.S.A. 75-2949(g), the next subsection of the statute, states: "No employee shall be disciplined or discriminated against in any way because of the employee's proper use of the appeal procedure."

Based on the plain language of K.S.A. 75-2949(g), it is clear that there is a public policy against State employers retaliating against employees for using the appeal procedures to challenge dismissals, demotions, and suspensions under K.S.A. 75-2949(d)-(f). Moreover, given that the language is within a statute, meaning that the

36

legislature enacted this provision, it is readily apparent that the policy is "so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt." See *Riddle*, 27 Kan. App. 2d at 86.

Additionally, it is important to point out that even if this express language did not exist, the public policy could be inferred from the KCSA's statutory scheme. K.S.A. 75-2925 states that the purpose of the KCSA is "to establish a system of personnel administration that meets the social, economic and program needs of the state of Kansas," which includes a system to "develop and maintain an effective and responsible work force." K.S.A. 75-2949(d)-(f) establishes procedures for employees to appeal their dismissals, demotions, or suspensions. Thus, obviously, the legislature enacted the rules allowing public employees to appeal their dismissal, demotions, or suspensions because it believed that such an appeal process was necessary to develop and maintain an effective and responsible work force. In turn, any employers' retaliation against employees for using those appeal procedures would most certainly undermine the legislature's goal of allowing those appeal procedures in the first place.

This conclusion is consistent with our Supreme Court's previous findings in the context of the KWPA. In *Campbell*, our Supreme Court held that because the purpose of the KWPA was to ensure that employees could obtain their unpaid wages, Kansas has a public policy of protecting workers rights to their unpaid wages. 292 Kan. at 233-34. Consequently, the *Campbell* court held that Kansas also has a public policy against employers retaliating against employees exercising their rights under the KWPA because if such retaliation was allowed, it would undermine the underlying purpose of the KWPA. 292 Kan. at 233-34. The *Campbell* court reached this conclusion even though no language in the KWPA expressly prohibited employer retaliation against employees for the specific claim Campbell filed under the KWPA. 292 Kan. at 233-34. Applying the *Campbell* analysis to the facts of this case, we note that the failure to find that Kansas has a public policy against employers retaliating against employees exercising their rights to

37

appeal their dismissals, demotions, or suspensions under K.S.A. 75-2949 would undermine the public policy goals connected to the legislature's decision to allow those employees to appeal their dismissals, demotions, or suspensions in the first place.

In summary, by enacting K.S.A. 75-2949(g), the legislature clearly declared Kansas' public policy against employers retaliating against employees who appeal their dismissal, demotion, or suspension under K.S.A. 75-2949. Yet, even if this express statement of public policy was not made, the policy could still be implied through the KCSA's statutory scheme. Accordingly, an express declaration of public policy exists.

*Adequate Alternative Remedy*

Regardless of the express declaration of public policy, Hill is not entitled to bring a common-law tort of retaliation as a public policy exception to the general rule of at-will employment if other adequate alternative remedies exist. In *Campbell*, our Supreme Court emphasized that in making a determination whether an adequate alternative remedy existed, a court should look at (1) whether the alleged adequate alternative remedy redresses the same or a different harm and (2) whether the alleged alternative remedy would provide the employee-plaintiff with the same process. 292 Kan. at 236-37.

In arguing that Hill could not bring a private right of action, the State and Garcia touched on the adequate alternative remedy issue. It seems that the State and Garcia believe that Hill had an adequate alternative remedy under the KCSA. This is evidenced by the State and Garcia's emphasis on (1) the fact that K.S.A. 75-2957 of the KCSA states that persons who violate any provisions or rules of the act are guilty of a misdemeanor and (2) the fact that the *Connelly* court held that the KCSA provided the exclusive and adequate remedy for claims by public employees alleging retaliation for whistleblowing. See 271 Kan. 944, Syl.

38

Yet, regarding the State and Garcia's misdemeanor punishment argument, punishing a person for violating the KCSA does not result in an adequate alternative remedy for Hill. As Hill states in his cross-appellee's brief, if an employer was punished legally under K.S.A. 75-2957, this punishment would not remedy his suffering and damages as an employee. Moreover, in *Connelly*, when explaining that public employees alleging employer retaliation for whistleblowing had an adequate alternative remedy under K.S.A. 75-2973(d) of the KCSA, our Supreme Court never stated that employee-whistleblowers had an adequate alternative remedy because the employer-KCSA violator could be found guilty of a misdemeanor.

Regarding the State and Garcia's *Connelly* argument, *Connelly* and this case are distinguishable. As previously discussed, the *Connelly* case involved KHP troopers suing the KHP for common-law retaliatory discharge because the KHP allegedly dismissed the troopers after they exercised their whistleblowing rights. 271 Kan. at 955-56. The *Connelly* court held that the public employee troopers could not bring their common-law retaliatory discharge claims because K.S.A. 75-2973(d) provided an adequate remedy. 271 Kan. at 955-56. K.S.A. 2015 Supp. 75-2973(f) states in relevant part: "Any officer or employee of a state agency who is in the classified service and has permanent status under the Kansas civil service act may appeal to the state civil service board whenever the officer or employee alleges that disciplinary action was taken against the officer or employee in violation of this act." Thus, unlike K.S.A. 75-2949(g), K.S.A. 2015 Supp. 75-2973(f) not only prohibits retaliation but also provides employees with a means to appeal retaliation to the KCSB. As a result, the *Connelly* case and this case are distinguishable.

Finally, it is important to note that the KCSB's order dismissing Hill's January 22, 2013, appeal for lack of jurisdiction further supports that there is no adequate alternative remedy under the KCSA. In that order, the KCSB stated that it did not have authority to hear Hill's complaints since it is statutorily limited to hearing appeals "'concerning

39

demotion, dismissal, or suspension of a permanent employee in the classified service.'" See K.S.A. 75-2929d(a)(1). Thus, the KCSB has recognized that Hill does not have an avenue to complain about his alleged retaliatory job placement in Troop E under the KCSA.

Based on the preceding analysis, it is clear (1) that an express public policy against employers retaliating against employees for exercising their rights to appeal dismissals, demotions, and suspensions under K.S.A. 75-2949 exists and (2) that no adequate alternative remedy for Hill's retaliatory job placement claim exists. Generally, this would be enough to establish a public policy exception to at-will employment. Nevertheless, because Hill is not suing for a recognized common-law tort like retaliatory discharge or retaliatory demotion, our analysis does not end here. This court must consider whether a person can sue for a retaliatory job placement.

*Is Retaliatory Job Placement a Valid Common Law Tort?*

The State and Garcia rightfully assert that this is the first case where a plaintiff has attempted to bring a retaliatory job placement claim in Kansas and the first case where a Kansas court has recognized a retaliatory job placement claim. To review, at the trial court, the State and Garcia argued that Hill's action should be dismissed because retaliatory job placement was not a recognized tort. The trial court rejected this argument, ruling that retaliatory job placement constituted a valid tort based on our Supreme Court's analysis in *Brigham*, 262 Kan. 12, holding that a retaliatory demotion was a valid tort. On appeal, the State and Garcia's arguments concerning why the trial court erred in determining that a common-law tort for retaliatory job placement exists centers on their belief that *Brigham* is distinguishable and that Garcia's discretion is unreviewable. Hill counters that the trial court's interpretation of *Brigham* was correct and that even though Garcia has discretion to take certain actions within the KHP, he did not have discretion to retaliate against him.

Brigham *Background*

To date, Kansas has recognized two types of common-law retaliation torts—retaliatory discharge and retaliatory demotion. *Brigham*, 262 Kan. at 19-20. A tort for retaliatory demotion was recognized by our Supreme Court in *Brigham* in 1997. 262 Kan. at 19-20. In determining that a tort for retaliatory demotion exists, the *Brigham* court acknowledged that other courts did not recognize a tort for retaliatory demotions, in part, because of the risk that doing so would "open floodgates, [to] unforeseen and unwarranted results." 262 Kan. at 15. Nevertheless, the *Brigham* court held that it would recognize a tort for retaliatory demotion because "[t]he linchpin of the tort for retaliatory demotion is a violation of public policy." 262 Kan. at 19. Moreover, in describing the differences between a retaliatory discharge and a retaliatory demotion, the *Brigham* court explained:

> "The employers' violation of public policy and the resulting coercive effect on the employee is the same in both situations. The loss or damage to the demoted employee differs in degree only. We do not share the employers' concern that a torrent of litigation of insubstantial employment matters would follow in the wake of our recognition of a cause of action for retaliatory demotion and, even if we did, it does not constitute a valid reason for denying recognition of an otherwise justified cause of action." 262 Kan. at 20.

Based on the preceding holdings, the trial court ruled that a retaliatory job placement tort was a logical extension of a retaliatory demotion tort. Yet, the trial court did not provide any closer analysis of why Kansas should recognize a common-law tort for retaliatory job placement. A closer analysis of what Hill is actually alleging establishes that there is an inherent problem with recognizing a common-law tort for retaliatory job placement in this context.

41

*Breakdown of a Common-Law Tort for Retaliatory Job Placement—No Harm Alleged*

To begin with, Hill is suing for a tort. Black's Law Dictionary defines tort as follows:

"A civil *wrong*, other than breach of contract, for which a remedy may be obtained, usu. in the form of damages; a breach of a duty that the law imposes on persons who stand in a particular relation to one another • Tortious conduct is typically one of four types: (1) a culpable or intentional act *resulting in harm*; (2) an act involving culpable and unlawful conduct causing *unintentional harm*; (3) a culpable act of inadvertence involving an unreasonable *risk of harm*; and (4) a nonculpable act resulting in *accidental harm* for which, because of the hazards involved, the law imposes strict or absolute liability despite the absence of fault." (Emphasis added.) Black's Law Dictionary 1717(10th ed. 2014).

As emphasized by the italicized words within the above definition of tort, torts inherently involve some sort of harm.

Moreover, Hill is not suing for just any type of tort, but a specific tort based on his employer's retaliation. Black's law dictionary defines "retaliation" as "[t]he act of *doing someone harm* in return for actual or perceived injuries or wrongs; an instance of reprisal, requital, or revenge." (Emphasis added.) Black's Law Dictionary 1510 (10th ed. 2014). Thus, like a tort, an inherent part of retaliation is harming another. In other words, an action cannot be retaliatory unless it inflicts harm on another.

Again, in Kansas, our courts have recognized a common-law tort for retaliation for retaliatory discharge and retaliatory demotion. When employers discharge their employees, their employees lose their jobs, their source of income, and any sort of benefits attached to that job. When employers demote their employees, their employees

lose a level of employment status that likely includes loss of pay and loss of benefits. Accordingly, both discharges and demotions harm the employee.

Under the particular circumstances of this case, it is undisputed that Hill's job placement in Troop E resulted in no harm, that is, no loss of job, job status, pay, or benefits. Assuming arguendo that Hill's job placement in Troop E is a "transfer" and not an "assignment," the KCSA states that a transfer occurs when an employee in the civil service moves "from a position in one class to a position in another class when the duties and compensation are similar." K.S.A. 75-2947(a). Similarly, the Kansas Department of Administration, the agency which the KCSB is under, defines transfer as a "change by an employee from one position to another position with a close similarity of duties, essentially the same basic qualifications, and the same pay grade." K.A.R. 1-2-88. Moreover, the KHP's MOA simply states that a transfer of a trooper is the movement of a trooper from his or her county of current established residence to another county.

Thus, an agency transfer, by definition, does not involve a harm. Instead, a transfer is a lateral move from one position to another with similar or identical duties and similar or identical pay. More importantly, in the KHP, a trooper transfer does not involve any change in employment other than the county of work location.

Having established that retaliatory discharge and demotion torts must involve harm, we are very doubtful that our Supreme Court would recognize a tort for retaliatory job placement. Although our Supreme Court's position on this issue would be an interesting question, we do not have to answer that question here. For our research has revealed that all recognized retaliatory torts involved some showing of harm, for instance, that a plaintiff has suffered a loss of job status, a loss of pay, or a loss of benefits. Without a showing of this kind of harm, Hill's argument for extending the common-law tort for retaliation in violation of public policy is a departure from the parameters established by our Supreme Court in other cases where the court has recognized this kind

43

of a tort. Here, Hill argues that he was harmed by his employer's decision to place him in or transfer him to Troop E. But this job placement or transfer, by definition, was a lateral move devoid of any recognizable harm in the form of diminished job status, decreased compensation, or reduced benefits. Moreover Hill has simply never attempted to show that his alleged harm falls within any recognizable harm such as loss of job status, loss of pay, or loss of benefits. Thus, this is reason alone for rejecting Hill's claim for a retaliatory job placement.

Although the *Brigham* court provided a fairly broad rule for determining if a common-law tort for retaliation in violation of public policy exists, it did not hold that employees could sue their employers for taking some harmless action. As a result, the State and Garcia's argument that the *Brigham* holding does not extend "to cover minor personnel actions" is correct in that the holding does not extend to cover employer actions that fall outside the established thresholds for a retaliatory tort. In turn, the trial court erred when it held that a common-law tort for retaliatory job placement was a logical extension of a retaliatory discharge or demotion based on *Brigham*. Moreover, it further erred by recognizing the existence of a common-law tort for retaliatory job placement and by denying the State and Garcia's motions to dismiss.

*Sovereign Immunity*

Finally, the State and Garcia argue that Hill's retaliatory placement claim is barred under the doctrine of sovereign immunity. First, the State and Garcia argue that the State has not waived its immunity to be sued, as evidenced by the language of K.S.A. 2015 Supp. 75-6103(a) of the KTCA. The State and Garcia also assert that even if the State waived its immunity under the KTCA, Hill's claim is still barred under (1) the discretionary function exception and (2) the enforcement or failure to enforce the law exception. Hill counters that the State waived its immunity by way of the KTCA, and

neither the discretionary function exception nor the enforcement or failure to enforce the law exception apply.

*Sovereign Immunity Background*

Questions concerning sovereign immunity are jurisdictional and can be raised at any time. *Purvis v. Williams*, 276 Kan. 182, 197, 73 P.3d 740 (2003). Because sovereign immunity is jurisdictional, courts are compelled to address it. *Connelly*, 271 Kan. at 962. Moreover, questions involving the application of the KTCA involve statutory interpretation. *Wilson v. Kansas State University*, 273 Kan. 584, 586, 44 P.3d 454 (2002). Interpretation of a statute involves a question of law over which this court exercises unlimited review. *Neighbor v. Westar Energy, Inc.,* 301 Kan. 916, 918, 349 P.3d 469 (2015).

Generally, a person cannot sue the State without the State's consent. *Commerce Bank of St. Joseph v. State*, 251 Kan. 207, 213, 833 P.2d 996 (1992). *In Commerce Bank of St. Joseph*, our Supreme Court explained:

> "No suit, whether at law or in equity, can be maintained against the state unless the state has given its consent or waived its immunity. The purpose of the immunity is to protect the state from interference with the performance of its governmental functions." 251 Kan. at 213-14.

Nevertheless, State immunity may be relinquished in three different ways: (1) when the State consents to the suit; (2) when "the application of *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), and its progeny is appropriate"; and (3) when Congress has abolished State immunity. *Connelly*, 271 Kan. at 961, quoting *Schall v. Wichita State University*, 269 Kan. 456, 466, 7 P.3d 1144 (2000).

45

When the legislature enacted the KTCA, the legislature waived governmental liability for tort claims, subject to many exceptions. K.S.A. 2015 Supp. 75-6103(a). The KTCA does not create a new cause of action; instead, it merely removed the State's ability to assert immunity as a defense unless one of the many exceptions applies. See *Gehring v. State*, 20 Kan. App. 2d 246, 251, 886 P.2d 370 (1994). "[T]he KTCA makes liability the rule and immunity the exception, and the burden is on the State to establish it is entitled to any of the stated exceptions." *Chelf v. State*, 46 Kan. App. 2d 522, 525, 263 P.3d 852 (2011).

Two exceptions to liability under the KTCA include the discretionary function exception and the enforcement of or failure to enforce a law exception. K.S.A. 2015 Supp. 75-6104(e), the discretionary function exception, states that the government and its employees acting within the scope of the employment shall not be liable for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." K.S.A. 2015 Supp. 75-6104(c), the enforcement exception, states that the government and its employees acting within the scope of the employment shall not be liable for the "enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, rule and regulation, ordinance or resolution."

Moreover, K.S.A. 2015 Supp. 75-6103(a) states:

> "Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state."

Stated another way, "a governmental entity can be found liable for the negligent or wrongful act or omission of any of its employees while acting within the scope of their

46

employment only if (1) a private person could be liable under the same circumstances and (2) no statutory exception to liability applies." *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 585, 214 P.3d 1173 (2009). "A statute waiving [state's] immunity must be strictly construed and [a] court has no right to enlarge the scope of the statute or to amend law by judicial interpretation." *Brown v. State Highway Commission*, 206 Kan. 49, 476 P.2d 233 (1970).

*K.S.A. 2015 Supp. 75-6103(a)*

The State's first argument regarding sovereign immunity is that the plain language of K.S.A. 2015 Supp. 75-6103(a) establishes it has not waived sovereign immunity. Specifically, the State hones in on the language stating that a government entity is only liable "if a private person, would be liable under the laws of this state." K.S.A. 2015 Supp. 75-6103(a). Then, the State cites *Prager v. Kansas Dept. of Revenue*, 271 Kan. 1, 20 P.3d 39 (2001), in support of its argument. Hill responds by simply stating that "[b]ecause a private person would be liable for committing the tort of retaliation and discrimination based upon public policy as provided by K.S.A. 75-2949(g), the State of Kansas through K.S.A. 75-6103(a) has waived sovereign immunity."

In *Prager*, Prager sought damages against the Kansas Department of Revenue and a few of its employees for depriving him of his rights to free speech both under the United States and the Kansas Constitutions. 271 Kan. at 32. Citing K.S.A. 75-6103(a) of the KTCA, the Department of Revenue argued that "because the KTCA provided that a governmental entity would be liable only if a private person would be liable and there was no statutory or common-law cause of action by which a private person could be found liable for deprivation of Prager's constitutional rights, then neither the Department nor [its employees] could be held liable for violation of Prager's constitutional rights." *Prager*, 271 Kan. at 32. Our Supreme Court agreed with the Department of Revenue, explaining:

47

"The language of K.S.A. 75–6103(a) is plain that the government could only be liable under the KTCA 'under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.' Under this language, a governmental entity bears no greater liability than would a private person or entity operating in the private sector, and a plaintiff seeking recovery under the KTCA must raise a recognized tort action. [Citation omitted.]

"Prager has failed to cite any Kansas case permitting a private person or entity to be found liable for money damages for interfering with someone's right of free speech under either the United States or Kansas Constitutions." *Prager*, 271 Kan. at 36-37.

Despite Hill's assertions to the contrary, the analysis in *Prager* is equally applicable to his case. *Prager* establishes that the State can only be liable to the extent that a private person would be liable, and a private person can only be liable for a recognized tort action. Nevertheless, Hill has not cited any authority where a private person was liable for a common-law tort of retaliatory job placement. Recognizing that this would be the first time in Kansas history that such an action was allowed, Hill has tried to establish that this is a valid tort. As already discussed at length, however, Hill has not raised a valid tort claim because a lateral change in job placement does not constitute retaliation. Accordingly, Hill has not raised a recognized tort action.

In turn, a private person would not and could not be liable for Hill's alleged retaliatory job placement claim under the laws of the state. Because a private person could not be liable for a retaliatory job placement, then the State has not waived its immunity under K.S.A. 2015 Supp. 75-6103(a). Furthermore, because the discretionary function exception and the enforcement or failure to enforce the law exceptions are only applicable when a plaintiff brings a recognized tort action against a governmental entity, no further *analysis* regarding the applicability of these exceptions is necessary.

48

In summary, the State did not waive its immunity. Accordingly, the trial court erred when it found otherwise in denying the State's motion to dismiss. As a result, we reverse.

*Conclusion*

The State and Garcia's arguments concerning the KJRA and Hill bringing a private right of action fail. Nevertheless, the State and Garcia have successfully established (1) that Hill's suit for retaliatory job placement cannot proceed because it is not a valid common-law tort and (2) that Hill's suit against the State is barred under K.S.A. 2015 Supp. 75-6103(a) because Hill is not suing for a recognized tort. Accordingly, the trial court erred when it denied the State and Garcia's respective motions to dismiss. As a result, we reverse the trial court's ruling and dismiss Hill's action.

*Did the Trial Court Err by Granting the State's and Garcia's Motion for Summary Judgment?*

Next, assuming arguendo that Hill's retaliatory job placement is a recognized tort, we determine that the trial court did not err when it granted summary judgment in favor of the State and Garcia.

In his appellant's brief, Hill argues that the trial court erred when it granted the State and Garcia's motion for summary judgment for two reasons. First, Hill argues that he presented sufficient evidence to establish a prima facie case of "retaliatory transfer." Then, Hill argues that he presented sufficient evidence to create a genuine issue of material fact as to whether the real reason the KHP transferred him to Troop E was in retaliation for appealing his dismissal under K.S.A. 75-2949(g). The State and Garcia counter that the trial court correctly granted their motion for summary judgment because Hill both failed to establish a prima facie case of retaliation and failed to establish that

their critical shortage of troopers in Troop E explanation for why Hill was placed in Troop E was a mere pretext.

*Standard of Review*

An appellate court exercises de novo review over a trial court's decision to grant summary judgment. *Hansford v. Silver Lake Heights*, 294 Kan. 707, 710, 280 P.3d 756 (2012). Our Supreme Court has explained:

> "Summary judgment is appropriate when the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." *Mitchell v. City of Wichita*, 270 Kan. 56, Syl. ¶ 1, 12 P.3d 402 (2000).

Thus, summary judgment is appropriate only when both the facts and the law of a case establish that the plaintiff is not entitled to relief. Yet, only facts that affect a controlling issue constitute genuine issues of material facts. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

*Burden Shifting Approach in Employment Retaliation Cases*

All parties agree that in employment cases, the plaintiff must establish a prima facie case of retaliation. Again, before this case, Kansas courts have dealt with cases

involving retaliatory discharges or retaliatory demotions. See *Brigham*, 262 Kan. at 20. In the retaliatory discharge and retaliatory demotion cases, our courts have explained that the elements of a prima facie case generally occur when (1) the plaintiff exercised a statutory or constitutional right; (2) the employer had knowledge of the plaintiff's exercise of that right; (3) the employer discharged or demoted the plaintiff; and (4) a causal connection between the protected activity and the discharge or demotion existed. *Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n*, 272 Kan. 546, Syl. ¶ 4, 35 P.3d 892 (2001). Because this case does not involve a discharge or demotion, however, the trial court substituted the language in prong three and prong four with "adverse employment action." The parties seem to be in agreement that this generalized language is appropriate. Moreover, this makes practical sense since the core of prong three is that the employer took some retaliatory action against the employee-plaintiff.

Accordingly, the following generalized standard for establishing a prima facie case of retaliation is appropriate in this case. To establish a prima facie case of retaliation plaintiffs must show the following: (1) that they had engaged in a protected activity; (2) that the employer knew they had engaged in a protected activity; (3) that the employer then took some adverse employment action against them; and (4) that this adverse employment action is causally connected to their use of the protected activity. Once plaintiffs have proven that a prima facie case exists, there is a rebuttable presumption of retaliatory intent. *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1276, 38 P.3d 679 (2002).

An employer may then refute this rebuttable presumption of retaliatory intent by producing a legitimate and nondiscriminatory reason for the action. *Bracken*, 272 Kan. at 1276. If the employer provides a legitimate and nondiscriminatory reason for the action, employees "must assert specific facts establishing a triable issue as to whether the employer's reason for the discharge is a mere cover-up or pretext." *Bracken*, 272 Kan. at 1276. "'If no facts relating to the pretextuality of the defendant's action remain in dispute,

51

summary judgment is appropriate.' [Citation omitted.] On the other hand, should the plaintiff come forth with a prima facie case and evidence that the defendant's reasons are a pretext, the case must go to the jury. [Citation omitted.]" *Bracken*, 272 Kan. at 1276. A plaintiff need only establish that the employer's reasons are pretextual by a preponderance of the evidence at the summary judgment stage. *Bracken*, 272 Kan. at 1276-77. Nevertheless, a plaintiff cannot survive a summary judgment motion and establish that the employer's reasons were pretextual by relying on inferences, speculation, or conjecture. See *Lloyd v. Quorum Health Resources, LLC*, 31 Kan. App. 2d 943, 954, 77 P.3d 993 (2003); see also *Wilson v. McDaniel*, No. 109,898, 2014 WL 3019946, at *9 (Kan. App. 2014) (unpublished opinion) (holding that "speculation and conjecture are insufficient to avoid summary judgment"); and *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997), quoting *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (holding that "'[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment'").

*Hill Fails to Establish a Prima Facie Case of Retaliation*

Accordingly, the first step this court must consider for summary judgment purposes is whether Hill established a prima facie case of retaliation. Again, the trial court found that Hill failed to establish a prima facie case of retaliation because although he established the first two prongs of a prima facie case of retaliation, he failed to establish (1) that the KHP took some adverse employment action against him by placing him in Troop E or (2) that his placement in Troop E was causally connected to his appeal to the KCSB.

*Adverse Employment Action*

Regarding the trial court's finding that he failed to establish that the KHP took an adverse employment action by placing him in Troop E, Hill responds that he did establish

that his placement in Troop E constituted adverse employment action for two reasons. First, Hill points to the fact that K.S.A. 75-2949(g) has very broad language. It seems Hill argues that because this language is so broad, stating that discipline or discrimination against an employee for using the appeal procedures "in any way" is inappropriate, his placement in Troop E might constitute an adverse employment action. This is the same logic Hill used while attempting to show that a "retaliatory transfer" constituted a viable tort under the public policy exception to at-will employment.

Yet, the fact that a job placement might be made for retaliatory purposes and the fact that it might fit within the scope of disciplinary or discriminatory actions as stated under K.S.A. 75-2949(g), does not mean that a job placement constituted an adverse employment action. Here, to establish a prima facie case of retaliation, Hill had to establish that his job placement in Troop E was actually adverse. As explained in the preceding section, typically plaintiffs suing for retaliation must establish that they were discharged or demoted. Discharges and demotions come with major negative consequences, including loss of pay, loss of benefits, and loss of status. In short, for something to be adverse, it must be unfavorable, disadvantageous, or harmful in some way.

Accordingly, Hill's argument that his placement in Troop E might fit within the definition of the discipline and discrimination discussed in K.S.A. 75-2949(g) consists of that common fallacy of begging the question because his argument assumes his transfer was an adverse employment action. As a result, the argument does not lessen the trial court's finding that Hill failed to establish his placement in Troop E constituted an adverse employment action.

Hill's second argument regarding why he established that his job placement in Troop E was an adverse employment action is equally unpersuasive. Hill contends that the fact that he was the only trooper that was "involuntarily transferred" in decades is per

53

se evidence that his placement in Troop E constituted an adverse employment action. Nevertheless, Hill's argument misses the point. Involuntary transfers are not necessarily always unfavorable. Hill assumes just what he is trying to prove: that the involuntary transfer was unfavorable. Here, Hill uses his conclusion as a premise. More importantly, assuming that Hill was "involuntarily transferred" versus "assigned," Hill has failed to explain how the involuntary transfer negatively affected *his* employment as a trooper with the KHP.

Moreover, it is readily apparent that Hill fails to include such an explanation because any involuntary transfer did not negatively impact his employment. A transfer, whether voluntary or involuntary, does not affect a trooper's pay or benefits. Moreover, the involuntary transfer was not a form of punishment for the following reasons: (1) Garcia, as the superintendent of the KHP, had the discretion to transfer troopers whenever and wherever he pleased and (2) Hill accepted his position as a trooper knowing and agreeing that he could be transferred whenever and wherever the superintendent desired.

Most importantly, Hill's arguments ignore that the uncontroverted evidence establishes his placement in Troop E was not unfavorable in any way. As discussed in the trial court's order granting summary judgment, Hill received the same pay, benefits, status, responsibility, and rank upon his placement in Troop E. Thus, nothing within the record and nothing Hill has argued supports that his job placement in Troop E constituted adverse employment action. This clearly contravenes Kansas' rule that plaintiff suing for the common-law tort of retaliation must establish that the employer took some negative action because the plaintiff invoked a protected right. See *Rebarchek*, 272 Kan. 546, Syl. ¶ 4.

Additionally, this conclusion is supported by cases from the United States  Tenth Circuit Court of Appeals. For example, in *Lunow v. City of Oklahoma City*, 61 Fed.

54

Appx. 598, 605 (10th Cir. 2003) (unpublished opinion), the Tenth Circuit held that a fire department's decision to transfer a firefighter to a different shift at a different station, which the firefighter considered to have subpar equipment and to be located "out of the mainstream," did not constitute adverse action for 42 U.S.C. § 1983 action purposes. In *Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1267-68 (10th Cir. 2004), the Tenth Circuit held that a state college employee could not prove adverse action under Title VII of the Civil Rights Act of 1964, following her job reassignment when the facts established that the reassignment was merely an inconvenience and did not result in the loss or employment, compensation, or benefits.

Although these cases involve different statutory issues, their holdings are helpful because it supports that in order for Hill to successfully make a prima facie showing of adverse employment action, he cannot simply provide evidence establishing his disappointment in being transferred to Troop E. Instead, Hill must provide evidence demonstrating that his placement in Troop E was actually adverse. Because Hill failed to do this, he failed to establish a prima facie case of retaliation. Accordingly, the trial court did not err when it granted summary judgment in favor of the State and Garcia.

*Causal Connection*

Regarding the trial court's finding that Hill failed to establish a causal connection between his successful appeal to the KCSB and his placement in Troop E, Hill responds that he established a causal connection because of the close proximity in time between his successful appeal and his placement in Troop E. Hill argues that it is obvious that his placement in KHP was related to his successful KCSB appeal because Garcia's letter telling him he would have to report to Troop E was written just 7 days after the KCSB issued its written order reinstating him as a trooper. He further argues that the fact the KHP denied his hardship requests and make-a-wish voluntary transfer requests supports that there is a causal connection between his successful KCSB appeal and his placement

55

in Troop E. Citing *White v Tomasic*, 31 Kan. App. 2d 597, 602, 69 P.3d 208 (2003), Hill then emphasizes that all that is required to prove the causal connection to establish a prima facie case of retaliation is circumstantial evidence.

> "Proximity in time between the claim and discharge [or in this case job placement] is a typical beginning point for proof of a causal connection. [Citation omitted.] Close temporal proximity between [the invocation of a protected right] and the adverse employment action *may* be 'highly persuasive evidence of retaliation.'" (Emphasis added.) *White*, 31 Kan. App. 2d at 602.

Undoubtedly, the short time between the KCSB order reinstating Hill from his dismissal and the letter from Garcia placing Hill in Troop E leans in Hill's favor in establishing that a causal connection exists. Yet, this evidence alone is very weak. In essence, Hill's argument is post hoc and can be broken down into the following syllogism: (1) The KCSB order amending his dismissal to a suspension was issued before Garcia sent the letter stating that his new job placement would be in Troop E; and (2) therefore, the KCSB order amending his dismissal to a suspension must have caused his new job placement in Troop E. Obviously, Hill would not have been reinstated without the successful KCSB appeal. Nevertheless, the KCSB order did not necessarily result in Hill's retaliatory placement in Troop E. There are a variety of reasons why the KHP might have placed Hill in Troop E. This is likely why this court has previously explained "[t]he fact that the claim preceded termination does not, by itself, establish cause and effect." *Lopez-Vargas v. Russell Stover Candies*, *Inc*., No. 92,225, 2004 WL 3048956, at *3 (Kan. App. 2004) (unpublished opinion).

Moreover, in the light most favorable to Hill, the denials of Hill's transfer requests do not help establish Hill's causal connection argument. Even without considering the State and Garcia's explanations for why Hill's hardship and make-a-wish transfer requests were denied, KHP policy provides that these requests can be denied for any reason. Additionally, the only basis for an interpretation that those requests were denied in

56

retaliation is that Hill says they were denied in retaliation. This court, however, has held that "[a]n employee's beliefs and feelings were insufficient to establish the required nexus between the employee's discharge and any protected activity." *Bracken*, 272 Kan. at 1277, citing *Blackwell v. Shelter Mut. Ins. Co.*, 109 F.3d 1550 (10th Cir. 1997). Accordingly, the denial of the transfer requests cannot support Hill's argument that a causal connection exists.

As a result, all that remains in support of the causal connection is Hill's post hoc argument that because his placement in Troop E followed closely after his successful KCSB appeal, it must have been the result of his successful KCSB appeal. As previously stated, however, close proximity in time between the employee's invocation of a protected right and the alleged adverse employment action cannot be the only evidence supporting a causal connection. See *Lopez-Vargas*, 2004 WL 3048956, at *3. Thus, Hill has not provided sufficient evidence to establish a prima facie case that a causal connection between the successful KCSB appeal and his placement in Troop E exists based on what he has argued on appeal. Consequently, the trial court did not err when it found that Hill had failed to establish a causal connection existed, and it also did not err when it granted the State and Garcia's motion for summary judgment.

*Conclusion*

To conclude, Hill failed to present evidence to establish a prima facie case of retaliation because there was no evidence that his placement in Troop E constituted adverse employment action. Nevertheless, even if there was evidence supporting that Hill's placement in Troop E constituted an adverse employment action, summary judgement was still appropriate because Hill failed to provide evidence establishing a causal connection between his successful KCSB appeal and his job placement in Troop E. As a result, the trial court did not err by granting the State and Garcia's motion for summary judgment on these bases.

57

*Hill Fails to Establish That the State and Garcia's Reasons for Placing Him in Troop E Were a Pretext*

Finally, it is important to explain that even if Hill had established a prima facie case of retaliation, Hill would be unable to overcome his burden of proving that the State and Garcia's explanation for the reason why he was placed in Troop E was pretextual.

To review, the State and Garcia asserted that the reason Hill was placed in Troop E upon his return from suspension was because Troop E was suffering a critical shortage of troopers, worse than anywhere else in the State. Since the State and Garcia provided a nonretaliatory reason for Hill's job placement in Troop E, the burden shifted back to Hill to establish that this reason was a mere pretext. See *Rebarcheck*, 272 Kan. at 553. In granting summary judgment, the trial court, however, found that Hill was not capable of meeting this burden.

On appeal, Hill asserts that the trial court erred when it made this finding because the following facts support that the critical shortage troopers explanation was just a pretext: (1) Garcia's "involuntary transfer" of Hill to Troop E is the first "involuntary transfer" known of in the history of the KHP; (2) Garcia continued to place new troopers in divisions other than Troop E, including Troop H; (3) Garcia refused to consider placing him back in Troop H, even after the president of the troopers association told Garcia that it might look like retaliation; (4) Garcia denied his hardship request, even when he granted two other trooper's hardship requests; and (5) Garcia granted his transfer request to the turnpike because he was contractually obligated to do so. Nevertheless, there are problems with each of Hill's arguments.

First, regarding Hill's argument that he was the only trooper in decades to be "involuntarily transferred," as discussed already, the "transfer" versus "assignment" debate is truly irrelevant to the outcome of the case. What is important is the following:

(1) whether there was evidence that Hill's job placement in Troop E, instead of Troop H, following his successful KCSB appeal was unusual under KHP policy and (2) whether there was any retaliatory motive behind this placement. Yet, as the State and Garcia point out in their brief, Hill was the only known trooper to have successfully appealed his dismissal to the KCSB. Consequently, the KHP was dealing with an unprecedented situation. This means that Hill cannot prove that he was being retaliated against by the KHP based on his successful KCSB appeal by pointing to cases where other troopers were treated differently. Moreover, Hill cannot simply state that his "involuntary transfer" was retaliatory because no other trooper had been involuntarily transferred in recent memory. Instead, because the sum of Hill's predicament is unique, Hill must come up with other reasons why his placement in Troop E was retaliatory.

Accordingly, the entirety of Hill's argument that the "involuntary transfer" was retaliatory is based on his belief that it was retaliatory, and nothing else. Again, to successfully prove that an employer's explanation is a pretext, a plaintiff cannot rely on pure speculation. See *Lloyd*, 31 Kan. App. 2d at 954. Hill's belief, however, is nothing more than speculation. Thus, Hill's reliance that no other known trooper has been "involuntarily transferred" is unpersuasive for purposes establishing that the critical trooper shortage explanation is a pretext.

Second, Hill's argument that the KHP continued to place other troopers in other divisions of the State, including Troop H, also falls short. In arguing that the KHP's placement of other troopers in other divisions around the State, Hill never controverts the evidence suggesting that all divisions, Troop A-H, were suffering shortages while he was placed in Troop E. Hill never controverts the command staff testimony that they decided to place Hill in Troop E because that was the division in greatest need when Hill was reinstated as a trooper. Hill also never refutes Lieutenant Colonel Stoecklein's and Major Goodloe's explanations that Hill's placement in Finney County within Troop E was beneficial to the troop. For one thing, because Hill was a trained trooper, he could help

train the two new recruits on patrol in Finney County. Accordingly, the fact that the KHP placed troopers in divisions other than Troop E while Hill was working in Troop E, in no way undermines the State and Garcia's explanation that Hill was placed in Troop E based on the critical shortage of troopers in that division. Thus, Hill has failed to establish that the State and Garcia's argument was a pretext through this argument.

Third, Hill's argument that Garcia refused to consider placing him back in Troop H, even after the president of the KTSA told Garcia that it might look like retaliation, is patently meritless. Whether the president of the KTSA told Garcia that Hill's placement in Troop E may look like retaliation and whether the State and Garcia's critical shortage of troopers explanation for Hill's placement constitutes a pretext are totally unrelated points. The KTSA president's belief that Hill's placement in Troop E might look like retaliation is no more useful than Hill's belief that his placement in Troop E constituted retaliation. It is an opinion that does not disprove or undermine the State and Garcia's explanation for why Hill was placed in Troop E. Therefore, this argument also fails to establish that the State and Garcia's argument was a pretext.

Fourth, Hill's argument that Garcia denied his hardship transfer requests while granting two other trooper's hardship requests does not establish that the State and Garcia's critical shortage of troopers in Troop E explanation was a pretext. To begin with, as with his previous arguments, this argument is pure speculation. Hill guesses that Garcia denied his requests based on retaliation without providing any further detail. This reason, in and of itself, is enough to reject Hill's argument. See *Lloyd*, 31 Kan. App. 2d at 954 (holding that speculation and conjecture are not enough to prevent summary judgment).

Moreover, in making this argument, Hill does not controvert the following evidence, which entirely undermines any argument that the denial of his hardship request was retaliatory: (1) that there was a critical shortage of troopers in Troop E when he made

60

the request; (2) that he made the hardship request before he even reported for duty in Troop E; (3) that he wanted the transfer to take care of an extended family member, while the troopers whose requests were granted wanted the transfer to take care of immediate family members; (4) that he failed to provide additional medical documents supporting his hardship transfer request when asked, and the other troopers whose requests were granted provided those additional medical documents; and (5) that Captain Maier recommended the request be denied, which in turn led to Lieutenant Colonel Stoecklein suggesting to Garcia that the request be denied. In short, all of this evidence provides a clear and legitimate basis for why Hill's requests were denied and why the other trooper's requests were granted. Most importantly, Hill's speculative allegation neither undercuts this evidence nor establishes that the State and Garcia's critical shortage of troopers in Troop E explanation was really a pretext.

Fifth, Hill's argument that his ultimate transfer to the Troop G turnpike division establishes that the State and Garcia's explanation was a pretext is meritless. Hill asserts that Troop G positions are filled by seniority is proof that when Garcia's discretion to deny a transfer was removed, he received the transfer. Nonetheless, this argument hinges on the assumption that Garcia refused to grant Hill's other transfer requests for retaliatory reasons. In other words, the fact that Garcia transferred Hill to Troop G is noteworthy only if one accepts the premise that Garcia denied the other transfer requests to retaliate against Hill for his successful KCSB appeal. As addressed in the preceding paragraphs, however, his belief that his requests were denied based on retaliation is speculative and not supported by the evidence. Hence, because Hill's argument regarding his transfer to Troop G hinges on his already disproven subjective arguments, it also necessarily fails.

Moreover, as a final note on Hill's fifth argument, although he has suggested that a contract with the Kansas Turnpike Authority requires that the KHP superintendent fill vacancies within Troop G by seniority, Hill has never asserted, nor is there any evidence indicating, that the KHP superintendent can simply choose not to fill the vacant positions

61

within Troop G. Thus, if Garcia wanted to, he could have chosen not to grant Hill's transfer request to Troop G. Accordingly, the fact that Garcia decided to grant Hill's transfer to Troop G actually supports that he was not angry at Hill, since by moving to Troop G, Hill got both a raise and better benefits. In addition, the move allowed Hill to be closer to his mother, whom he wanted to help if the need occurred. It certainly does not help establish that the State and Garcia's critical shortage of troopers in Troop E explanation was a pretext.

In conclusion, Hill failed to establish a prima facie case of retaliatory placement. Yet, even if he had established a prima facie case of retaliatory placement, he has failed to establish that the State and Garcia's critical shortage of troopers in Troop E explanation was a mere pretext. Thus, the trial court properly granted the State and Garcia's motion for summary judgment.

Affirmed in part, reversed in part, and dismissed.